The evidence on which the State relied, and material to be stated, is as follows: J. L. Dosier testified: On the 26th of January last I was engineer of the Steamer Keystone. I knew John Barton, who is now dead. He was fireman on the Keystone. Whitfield was mate on the 26th January. We got to Murfreesboro at 7:15 p.m. I stayed on the boat 15 minutes. I left the whole crew on board except Henry Pool, Henry Cole, Peter, Bill, John Barton and George, about all except Whitfield. Henry Pool was one of the crew, but he was not left on board. I got to the boat about 9 o'clock, *Page 503 
and found John Barton missing. I looked at the door, and it was closed. I found a stream of blood. I stopped. Then next to the rail I saw something that looked like somebody overboard; then I opened the door and found a handkerchief and blood around behind the stove-pipe; I also found a pocket knife — John's knife; then I found keys and his cap. The blood was in a cooked condition. The fire went out Saturday night. Shortly afterwards the body was found, with $30 in the pockets in two bags. The body had been out of the water one and a half hours when I saw it. Hammer (produced) belonged to the Keystone. I found it underneath where blood was; fell through. It was bloody. Barton got the lick in the burr of his ear, and about the temple bone; there was an impression of the hammer on his cap; there were four wounds; some trickles of blood came from the ear after we took the body out. Whitfield and Barton stayed on the Boat Saturday night. Barton stayed underneath, and Whitfield on upper deck. Cross-examination: Any other hammer of that size would have done the same.
Evans testified: I was company's agent. On night of January 26, I saw John Barton about 8:30 o'clock. Whitfield went with me uptown. About 7:30 next morning I went to the wharf. I went on board and saw blood near the engine door-saw more blood on the door. The handkerchief was found where the body was pulled around and thrown overboard. The body, when raised, had blows on the head. The doctor examined the skull-it was not fractured. The hammer had blood on it; it was not in the usual place, having dropped in the fireman's room below; it usually stayed on a shelf in the room where deceased stayed. The blood dried up under the engine, though off from the engine it was cold; it appeared to be fresh blood dried. The tracks were examined outside and measured by me. They led from boat near the engine door on left side, shoe tracks, to a fence direct *Page 504 
south of boat to a stream which led up old road in direction of Drew Vaughn's house. Sumner measured the tracks also. There was also a woman's track, not measured, Sunday morning. The track was measured at other places. The man's track was made after a rain, the woman's before. Vaughan's foot was measured — the width of the heel and the width of the shoe. The length of his shoe compared to a dot with the track, and the heel was the same. The tracks measured led in direction of prisoner's house — at the peafield could not see it — went within 140 yards of his house; woman's track was older; made before the rain.
Dr. Gany testified: I examined the dead body, but did not find fracture, but contused wounds produced by some blunt substance — a hammer, for example. The lick would produce death. In my opinion, those wounds produced death.
B. Watford testified: I knew John Barton and Drew. Had conversation with prisoner about Barton on the 15th of June of last year. I was plowing. I said if it was my mule I would cut his throat. He said, if I had the spite against Barton as I had against the mule, I would go down there sometime and cut his throat and throw him overboard. He spoke about putting $50 improvement on his (Barton's) land, and did not get any pay for it. In October he said to me if Barton did not pay him he was going to have recompense. I have heard him speak of it several times since. He said that Barton had treated him wrong, and that but for him (Barton), he could get regular work on the boat. I have heard him say that Barton kept his money on the boat; that his wife was extravagant, and he kept it himself. Drew Vaughn married my wife's sister. He sent for me. I went to Drew's home Monday morning after the murder. He asked me if I had heard any suspicion about who had killed Barton; then asked me about picking him out a house when he got ready to buy one. Cross-examined: I told no *Page 505 
one about what prisoner had said to me. Charles Boone was present.
L. F. Sumner, constable: I measured tracks (exhibits measure). The measurement of the track fitted the prisoner's foot exactly. The tracks looked like the person was walking fast. On the way to the jail he spoke about his wife, saying she burnt the trousers. He said he burnt them up himself.
Charles Boone: I saw the prisoner the night Barton was killed. I heard him say in June to Ben Watford that if he had as much ambition as he had against that old man he would go down there and knock him in the head and throw him overboard. I asked him what would become of him (prisoner). Said Barton answered him, saying, "He didn't care, so he got his recompense out of him." Cross-examined: Spoke of him as old gentleman.
Emma Boone: Before Christmas last, about three weeks before he killed him, he told me to tell John Barton if he did not pay him he would kill him and put him in a hole. Nobody was present but John Roberts' wife. I told John Barton.
J. C. Carter: Heard him on the 8th January last. He spoke about running on the Steamer Keystone — said Mr. Dee was a good captain. Uncle John would not give me a bit of chance when he ran on the boat with him; said "he is a mean old rascal — he cheated me out of $50." I remonstrated. He said, "I've got no money or nothing, but I'm going to have something." I heard him speak of John two or three times as a grand old rascal, when he ran on the boat.
Parker: I heard prisoner make those statements about Barton. Said old man John was a grand old rascal, and he was going to have his position if he had to kill him. Prisoner said he was going on the boat as foreman — November last. In January I was at father's. Drew was in there, and in going on said he wanted money to pay for land — said he was going on the boat. *Page 506 
J. P. Hedgepeth: I knew Barton. I went to the boat Sunday morning and searched for him and found him. I saw Vaughn on the night of the murder at 8:30. He had his jaws tied up.
Sheriff Tayloe: I heard prisoner make statements several times free from inducements and threats. About the second day after he was put in jail, he said he did not do the murder himself, but he knew who did. He said it was Henry Garriss, Henry Pool and Ben Watford. He said they did it. Prisoner was at the foot of the steps near a cedar tree, heard the scrimmage and heard the old man when he went overboard, and he then went to his house and did not come out until next day. He told that to anybody at any time, and told it several times.
Ben Watford: I was near when boat blew for wharf; was then at Hill's store about 12 o'clock that night. I and Henry Garriss and Henry Pool (the parties mentioned to the Sheriff by prisoner) did not kill him.
Whitfield: I am mate on the Steamer Keystone, and left the boat at 8:30 o'clock to buy provisions. I saw, among others, Henry Garriss, cook. Then I went to the boat about 20 minutes to 11 and went to my room and went to bed. When I left, I left five deck hands and John Barton. He slept below, aft. Next morning some lamps were burning which ought to have been put out. Then I saw some blood.
Sumner: Ben Watford was in Hill's store, and stayed there until 12 o'clock.
Hill: Ben Watford was in my store from 10 o'clock until 12 o'clock.
The State rested.
From a verdict of guilty of murder in the first degree and judgment thereon, the prisoner appealed.
Upon the conclusion of the evidence introduced by the State, the prisoner requested the Court to charge: "That there is no evidence before the jury sufficient to convict the prisoner of the murder," which request was refused and the prisoner excepted. A verdict of guilty was rendered; motion for new trial, etc., and prisoner appealed.
So the question for our determination is presented solely upon the evidence introduced and relied upon by the State, and upon which alone we must presume the jury acted in arriving at their verdict. So we are again confronted with the difficult and serious task of deciding whether the evidence is sufficient to go or be left to the jury, upon which, in some aspect of it, they might reasonably render a verdict of guilty. The finding of the fact at issue and the weight to be given to the evidence upon which the finding is made, are exclusively within the province of the jury; whether there is evidence sufficient to be submitted, is a question of law to be decided by the Court (State v. White, 89 N.C. 462; State v. James,90 N.C. 702; State v. Brackville, 106 N.C. 701; State v. Gragg,122 N.C. 1082), and with which we now have to deal in reviewing the ruling of his Honor in the Court below.
Considering the several circumstances testified to by the witnesses, collectively, we think they established such a state of facts as warranted his Honor in submitting them as some evidence of the prisoner's guilt. Malice is shown from the threats; motive is shown from his desire to get deceased out of the way so that he could get employment on the steamer; the killing was done at the place and in the manner indicated by his threats; his presence at the steamer on the night of the homicide is shown by the tracks, fitting, by measurement, his own, and also by his voluntary statement that he was near by and heard the scrimmage, and heard the old man when he went overboard, thus showing an opportunity; his professing knowledge of the homicide and failing to disclose *Page 508 
it until after his arrest and imprisonment; destruction of his trousers by burning them before arrested, and failure to explain the cause.
Whether these circumstances formed such an unbroken chain of evidence as to carry conviction of his guilt to a moral certainty, or beyond a reasonable doubt, rested in the judgment and conscience of the jury, over which the Court has no control. There is
No error.