STATE v. G. W. WILKINS.

(Filed 6 March, 1912.)

1. Murder—Circumstantial Evidence—Husband's Previous Conduct.

Where there is circumstantial evidence tending to connect the defendant with the commission of the crime and to show some preparation on his part to murder his wife, it is competent, as tending to show identification of the husband as the murderer and of his malice towards his wife, that they did not get on well together, and had quarreled shortly before the homicide was committed, when he drove her from his home, threatened to cut her with his knife and attempted to draw his pistol on her.

2. Murder—Motive—Evidence.

Motive for committing a homicide is not required to be proved in order to convict, when it is not of the essence of the crime charged, but it may be shown to identify the prisoner as the perpetrator of the crime, and to establish malice, deliberation, and premeditation.

APPEAL from *Ferguson, J.,* at November Term, 1911, of NASH.

The prisoner was indicted in the court below for the murder of his wife, and was convicted of murder in the first degree. The evidence tended to show the following facts:

The prisoner and deceased, who was his wife, lived about one mile from the town of Spring Hope in Nash County. For some time prior to the homicide there had been misunderstandings and quarrels between defendant and his wife, and about two weeks before the homicide the defendant drove his wife from their home, to the house of her mother, about twenty-five or thirty yards away. He then tried to drive her back, and upon her refusal to go, defendant struck the deceased and she returned the blow. On the same day defendant had a knife out and threatened to cut the clothes off the woman. He also made an attempt to draw a pistol, when a bystander caught him and took the pistol away from him.

About two days before the homicide the defendant said to a witness, Bunn, that his (defendant's) wife thought she was fooling him, dealing with other men, but, God damn her, he would

kill her and be hung for it. It further appears that the deceased and the defendant quarreled about another woman by the name of Lewis, and the defendant told deceased that she could get out, that he was going to bring another lady in there.

On the morning of the homicide defendant said to a witness, one Bettie Wiggins, that he had something to tell her, that he was not going to tell it then, but when he told it, it would be in red letters. On the same morning the defendant stated to another witness, Nellie Wiggins, that the deceased would not be with him but two days more; that she had other men and he was going to kill her; that he would rather kill her than to have her live with other men.

On the morning of the homicide deceased and defendant were both seen at their home about 11 o'clock. The woman was doing some washing and the man was cleaning his gun. About 11 o'clock his gun was heard to fire, and shortly thereafter the defendant remarked to a witness, Sessoms, who lived near, that his gun shot all right—right to the spot. An hour or two later this same witness heard the gun fire again, but paid no special attention to it.

During the same morning, a witness, Mamie Wiggins, saw the defendant and deceased at their home together. In the presence of the defendant, deceased said she was going to the cotton patch, but that it would be 12 o'clock before she could go, as she had to iron a shirt. About 3 o'clock P. M. the witness came back from the cotton patch, and defendant met her at his front gate, and asked her if she had seen Ida, his wife. Witness answered that she had not, and defendant said, "Yes, you have, because she put on some more clothes and went to the cotton patch."

About 4 o'clock in the afternoon defendant left his home and went to the town of Spring Hope. About night the mother of the deceased came home from the cotton patch, and neither the defendant nor the deceased could be found at their home. The mother made inquiry for her daughter, but nobody knew anything about her. The next morning search for the missing woman was renewed. A pile of "strips," presumably tobacco strips, was seen in the yard, which had not been there before. Under these strips was some fresh dirt with blood on it. Inside

the house was found an empty shell, on the floor, a shotgun with the barrel full of dirt and the overalls of the defendant with spots on them that looked like blood. Fresh dirt was noticed under the crib. The floor of the crib was torn up by the searchers, and there, about ten inches under the ground, was the dead body of Ida Wilkins. There was an ugly gunshot wound in her neck, made by small shot at close range.

The prisoner was arrested in Spring Hope on the day after the homicide, and after he was put in jail, he said that his wife had gone down to her father's. Thereafter, upon being told that he had killed his wife, he said that he was cleaning his gun and did not know his finger was on the trigger, when the gun went off and killed her. He said that she had laid out in the yard for about an hour, and then he buried her. That he started uptown to tell about it, but he was so frightened that he could not. The defendant offered no evidence.

There is a single exception to the testimony.

The solicitor asked Rhoda Ann Westray, mother of the deceased, how her daughter and her husband got along together. She answered, "Well, they did not live good together." Q. "State what you have seen transpiring between them in the way of quarreling." The prisoner objected to the question; the objection was overruled, and he excepted. The witness then proceeded to state that they quarreled, and related the quarrel that took place two Sundays before the homicide, when defendant drove deceased from his home, threatened to use the knife, and attempted to draw a pistol.

The prisoner asked the court to give instructions to the jury upon the different degrees of homicide, calling their attention to the essential elements of each offense and with special reference to the bearing of the evidence upon them, but it is not necessary to set them out.

The jury convicted of murder in the first degree, and from judgment entered upon the verdict the prisoner appealed, after having duly excepted to the rulings of the court.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*F. S. Spruill for defendant.*

WALKER, J. There is but one exception in this case that calls for any discussion, as we will presently show. The prisoner objected to the testimony of the witness, Rhoda Ann Westray, the mother of the deceased, as to whether the prisoner and his wife had lived together peaceably and as to any quarrels between them that she had seen. She answered that they did not live "good together," and that they had quarreled two Sundays before the homicide was committed, when the prisoner drove his wife from his home, threatening to cut her with his knife and attempting to draw his pistol. Except the admission of the defendant, which was made in contradiction of a previous statement by him as to the manner of the killing, there was no direct or positive proof of his guilt, but the evidence was circumstantial, there being no eye-witness to the tragedy. The circumstances tending to show that the prisoner had killed his wife were very strong, apart from his admission of the fact, and the State was compelled to rely upon the circumstances to show that he had murdered her deliberately and with premeditation. In this state of the proof, we fail to see why it was not competent and relevant to prove the relations between the parties, and especially that they had quarreled, the husband appearing to be the aggressor, and that he had even gone so far as to threaten her life, and had attempted to use his knife and draw his pistol. These facts, especially in connection with proof of the other circumstances, tended to show his malice towards her, and to assign a motive for the killing. But we think it has been expressly decided by this Court that such evidence is competent and is also relevant to the issue.

In *S. v. Rash,* 34 N. C., 382, similar evidence was offered against the defendant in that case, that is, to show ill-treatment of his wife by him, the charge being that he had murdered her. It was held that the evidence was competent, not only to identify the husband as the slayer of his wife, but to show his malice towards her. *Judge Nash,* delivering the opinion of the Court, said: "The first inquiry would be, who could be the perpetrator? and the mind would naturally turn upon the person who, either from interest or malice, might desire her death. Interest, in this case, could not exist, and malice alone could lead to the

deed.  Ordinarily, the eye of suspicion cannot turn upon the husband as the murderer of his wife, and when charged upon him, in the absence of positive proof, strong and convincing evidence—evidence that leaves no doubt in the mind that he had toward her that *mala mens* which alone could lead him to perpetrate the crime—is always material.  How else could this be done than by showing his acts toward her, the manner in which he treated her, and the declarations of his malignity?"

He then proceeds to show that no stronger proof of malice could be offered than the husband's brutal treatment of his wife and his suspicion that she had been unfaithful to him, his conduct evincing "a settled state of feeling inimical to her."  Underhill on Cr. Evidence, secs. 323, 327; *Sidberry v. State,* 133 Ind., 677.  In the case last cited it was held that where an indictment charges the defendant with the murder of his wife, testimony as to relations existing between them, previous to the homicide, and as to his treatment of her, is competent.  It is not necessary to show a motive for committing the crime, when motive is not of its essence, but it is relevant to prove a motive as a circumstance to identify the prisoner as the perpetrator of the crime, and to establish malice, deliberation, and premeditation.  *S. v. Adams,* 138 N. C., 688.  This exception cannot be sustained.

The other exception taken to the refusal of the court to give the instructions requested by the prisoner are equally untenable. A perusal of the charge of the court will disclose that the learned judge who presided at the trial gave full, clear, and accurate instructions with reference to every question contained in the prayers of the prisoner, and not only responded to them directly, but he presented the case to the jury in every possible phase, and was exceedingly fair and favorable to the prisoner in what he said.  He might have charged more strongly against him and yet have been well within the law.

We find no error in the record.

No error.