STATE v. JAMES PALMER, SR., AND JAMES PALMER, JR., ALIAS FOXY PALMER.

(Filed 13 April, 1949.)

**1. Homicide § 16—**

In a prosecution for homicide, the State has the burden of showing that deceased died by virtue of a criminal act and that such act was committed by the prisoner.

**2. Homicide §§ 20, 25—**

While evidence of motive is relevant as a circumstance to identify accused as the perpetrator of a homicide, such evidence, standing alone, is insufficient to take the case to the jury on the question of identity.

**3. Criminal Law § 31e—**

Evidence of shoeprints or tire tracks has no probative force to identify accused as the perpetrator of a crime unless it is shown that they were found at or near the place of the crime, were made at the time of the crime, and correspond respectively with the shoes worn by accused at the time of the crime or the car driven by accused at that time.

**4. Same—**

The opinion of a witness that a particular shoeprint is the track of a specified person is without probative force unless the witness describes unique characteristics upon which he bases his judgment of identity.

**5. Homicide § 25—Circumstantial evidence as to the identity of defendants as perpetrators of crime held insufficient to be submitted to jury.**

In this prosecution of one defendant for murder in the first degree and of the other defendant as an accessory after the fact to the murder, the State offered evidence of motive, and testimony as to automobile tire tracks and footprints found near the scene where the body was supposed to have been hidden in the woods some two days after deceased was last seen alive, and a track on the clay bank of a river near where the body was discovered and taken from the river some five days after deceased was last seen alive. There was no testimony, other than the bare opinion of witnesses, tending to identify the footprints as those of accuseds or identifying the tire tracks as those made by the car of the principal defendant, or evidence connecting the concealment of the corpse and the tire tracks found on the road. *Held:* The evidence raises merely a conjecture or speculation as to the identity of defendants as the perpetrators of the crime, and defendants' motions for a compulsory nonsuit are sustained in the Supreme Court on appeal. G.S. 15-173.

**6. Criminal Law § 32c—**

Testimony of an expert as to the similarity of strings taken from the trunk of defendant's automobile and strings of one of thirty-six different fabrics of an unidentified quilt is incompetent and without probative value when there is no evidence tending to identify the quilt as the one which was wrapped about the corpse when it was recovered from the river.

APPEAL by James Palmer, Sr., herein called Jim Palmer, and James Palmer, Jr., herein denominated Foxy Palmer, from *Williams, J.,* and a jury, at the August Special Term, 1948, of the Superior Court of LEE County.

It was alleged in one indictment that Jim Palmer murdered Otis McNeill, and in another that he was an accessory after the fact to the murder of Otis McNeill by an unnamed principal felon. Foxy Palmer, who is a son of Jim Palmer, was charged in a third indictment with being an accessory after the fact to the murder of Otis McNeill by his father. The three cases were tried together under an order of consolidation entered by the court over the objection of the accused.

Certain matters were not in dispute on the trial.

The accused and deceased resided in the vicinity of Tempting Church in Lee County. Tempting Church is a building devoted to public worship standing 60 feet northeast of the Loop Road, a soil surfaced highway, about five miles west of Sanford as a crow flies. This road has both of its termini in the northern edge of a highway, which runs from Sanford on the east to Carbonton on the west and which is known locally as the Carbonton Road. This highway is bitumized from Sanford to a point two-tenths of a mile east of its intersection with the eastern end of the Loop Road, and has a gravel surface from this point to the Plank Road,

which runs north and south and crosses the Carbonton Road virtually at right angles some three miles to the westward. The northern prong of the Plank Road is either of gravel or sand-clay, and runs northward from the Carbonton Road to Gulf, about four miles distant, where it intersects with United States Highway No. 421. It crosses Deep River, a natural watercourse, by bridge approximately half a mile south of Gulf. It is not possible to travel by vehicle from any point on the Loop Road to any other place without traveling on the Loop Road and either the eastern or the western branch of the Carbonton Road.

The Loop Road is of a total length of approximately a mile and a half. It winds in a northwesterly direction from its eastern terminus on the northern edge of the Carbonton Road, passing in succession the home of James McMillan, Tempting Church, the residence of Foxy Palmer, and the dwelling and store of Jim Palmer. It then curves abruptly, and proceeds southwesterly by the habitation of Andrew Woodard and Mrs. E. O. Wakefield to the place where its western end coalesces with the northern edge of the Carbonton Road. Tempting Church is not visible from the home of James McMillan to the southeast on account of intervening woods, but it can be seen from the dwelling of Jim Palmer standing on the south side of the Loop Road 500 yards to the northwest. A store building, where Jim Palmer sold groceries, is situated across the Loop Road from his dwelling. The residence of Foxy Palmer is located between Tempting Church and his father's home, but its exact distance from these structures is not disclosed by the testimony.

The house, where the deceased, Otis McNeill, resided, is in a *cul-de-sac* about half a mile northwest of the Loop Road. The only means of egress is a path leading to a dead-end road which passes at least six residences before merging with the northern edge of the Loop Road just west of the habitation of Andrew Woodard. Intervening woodlands render the Otis McNeill home invisible to persons at the Jim Palmer place.

Otis McNeill was about 5 feet, 8 inches in height, and weighed about 160 pounds. He was last seen alive by the State's witnesses about 6:00 o'clock on Monday morning, 15 March, 1948, 100 yards from his home walking south along the dead-end road which coalesced with the Loop Road west of the Andrew Woodard home. He was carrying a walking stick, and wearing an undershirt, an ordinary shirt, pants, coveralls, a blue coat, a felt hat, shoes, and overshoes. On the fifth day thereafter, namely, at 5:30 p.m. on Saturday, 20 March, 1948, his lifeless body was found afloat in Deep River south of Gulf near a place where the Plank Road runs within 25 or 30 steps of the river for a distance of approximately 300 feet. This spot is seven miles via the Loop Road, the Carbonton Road, and the Plank Road from Tempting Church, and about four miles as a crow flies from the Otis McNeill home.

The corpse was marked by five bullet wounds from a firearm which was never discovered, and had evidently been sunk in the river by weights attached to chains which were fastened around the neck and feet. An absence of water in the lungs indicated that the deceased had been shot to death before his body was put in the river. An examining physician had no opinion "about how long the body had been in the water," but concluded from its swollen and decomposed state that the deceased "had been dead six or seven days." When discovered, the corpse "was wrapped in a quilt," and all clothing was present, except the blue coat. The shirt and undershirt were perforated and bloody.

Both the prosecution and the defense presented testimony of great volume to sustain their respective positions as to the guilt or innocence of the accused. Indeed, the record in its entirety covers 381 pages. But no direct testimony was adduced on the trial as to when, where, or by whose hand Otis McNeill came to his death, or as to the whereabouts of his body before it was discovered in Deep River. The State bottomed its case on the theory that Otis McNeill was fatally shot by Jim Palmer in the woods directly across the Loop Road from Tempting Church soon after 6:00 a.m. on Monday, 15 March, 1948, and that his body lay in a "pressed down" place in such woods 92 feet south of the edge of the Loop Road until sometime between 7:30 and 8:00 p.m. on Wednesday, 17 March, 1948, when it was removed by Jim Palmer and Foxy Palmer and hauled by them in the trunk of Jim Palmer's blue Kaiser automobile by way of the Loop Road, the Carbonton Road, and the Plank Road to Deep River, where they submerged it in the water. To support this theory, the State relied on the circumstances set forth below.

Jim Palmer and Foxy Palmer had difficulties with the deceased in December, 1947, and January, 1948, resulting in charges of assault which were pending against them when the deceased disappeared. Moreover, Jim Palmer stated several weeks prior to the homicide that he would not harm Otis McNeill "for anything in the world," but that others would kill him "to get him out of the way the first chance they got" on account of a suspicion that he was reporting liquor law violations to the Sheriff.

The area southwest of the Loop Road in the immediate vicinity of Tempting Church belongs to the McMillan family, and is covered by trees and underbrush extending practically to the edge of the road. James McMillan, a witness for the State residing 450 yards southeast of Tempting Church, testified that he arose about 6 a.m. on Monday, 15 March, 1948, and soon thereafter heard six shots, which "sounded like a pistol" and "seemed to come from the direction of Tempting Church." Sometime after 8:00 p.m. on Wednesday, 17 March, 1948, searching parties examined the road and woods near Tempting Church. Two sets of shoeprints without distinctive features, one consisting of "big tracks" and

the other of "overshoe tracks," were noted directly across the Loop Road from Tempting Church, leading southward from the road up a clay bank to the edge of the woods at the top of the bank, where they ceased to be observable. The searchers proceeded in a southerly direction from this point into the woods and found Otis McNeill's blue coat, and a spot where "it looked like leaves had been pressed down over a space 2½ or 3 feet wide and about 5 or 6 feet long." The blue coat was 37 feet south of the edge of the Loop Road, and the "pressed down" spot was 92 feet south of the same place. Five days later Otis McNeill's walking stick was found 6 feet from the place where the blue coat had lain. The original searchers noted that the coat was "sprinkled with leaves" and that "two big footprints" without distinguishing peculiarities were impressed in a rotten log beside the "pressed down" place. After the body of the deceased had been removed from Deep River, to wit, on Monday, 22 March, 1948, the State's witness, Odie McBryde, noted a single "overshoe track" on the clay bank on the southwest side of the Loop Road directly opposite Tempting Church. He thereupon fitted an overshoe from the body of Otis McNeill into this track, and found that "it was a good fit."

The testimony of the State relating to these matters was to the effect, however, that the coat was intact and free from bloodstains when it was found; that nothing noteworthy was seen at or near the "pressed down" spot except the "two big footprints" in the rotten log; that no other tracks were discovered in the woods southwest of the Loop Road; that no visible trails of any character connected the "pressed down" spot with any other place; that rain fell in the locality in question at least twice between 6:00 a.m. on Monday, 15 March, 1948, and 7:30 p.m. on Wednesday, 17 March, 1948, and at least once between the last named hour and Monday, 22 March, 1948; that numerous peace officers and residents of the countryside tramped over the entire area in the vicinity of Tempting Church between 8:00 p.m. on Wednesday, 17 March, 1948, and Monday, 22 March, 1948; that both the overshoe of the deceased and the single "overshoe track" into which it was fitted on Monday, 22 March, 1948, lacked distinctive peculiarities; and that there was nothing to identify such single "overshoe track" as one of the "overshoe tracks" found on the bank on the night of Wednesday, 17 March, 1948.

About 7:30 p.m. on Wednesday, 17 March, 1948, Henry McNeill, the sexton, who was accompanied by his wife, Sarah McNeill, arrived at Tempting Church and turned on the lights in preparation for a "P. T. A. Meeting" being held there that night, thereby illuminating the church and the churchyard adjacent to the Loop Road for a "pretty good ways." As soon as this was done, a motor vehicle came from the northwest along the Loop Road and stopped in such road for approximately ten minutes

70 steps northwest of the driveway leading into the churchyard at Tempting Church. None of the State's witnesses avowed any knowledge of the identity of this automobile, or saw any person in its immediate vicinity. Sarah McNeill testified, however, that she heard a noise, which "sounded like somebody stepping on a brushpile," in the woods southwest of the Loop Road in proximity to the automobile just before it was put in motion and driven unlighted "right by the church when the lights were on and where people were" on its way to the eastern end of the Loop Road.

Subsequent to 8:00 p.m. on Wednesday, 17 March, 1948, imprints of automobile tires were found on the Loop Road where the automobile had stopped, and on the side of the Plank Road south of Gulf where the Plank Road runs within 25 or 30 steps of Deep River. The last mentioned imprints were evidently made by a motor vehicle which was turned around at the junction of the Plank Road and an old wagon road leading downhill towards Deep River. According to Sheriff A. G. Buchanan, a witness for the State, this old wagon road was a place "where people park and go fishing." There were no peculiarities about the tire tracks except that they appeared to be "fresh" and were similar "with respect to markings, ridges and grooves" to "6.50 x 15 Goodyear" tires having treads in good condition. The State's evidence was to the effect that Jim Palmer's blue Kaiser car was equipped with "6.50 x 15 Goodyear" tires with good treads; that manufacturers had made "millions" of such tires "just alike"; and that such tires were in general use in Lee County. While witnesses for the State testified generally that they observed imprints at the eastern intersection of the Loop Road and the Carbonton Road similar to those found where the automobile had stopped 70 steps northwest of Tempting Church and "followed those tracks to Deep River," a reading of the evidence in detail reveals that they meant simply that "every time they came to a side road they would get out and look up and down it with a flashlight" and that "those tracks did not turn off on any side road between there and the river." Besides, the State's evidence was to the effect that there were many automobile tracks upon all the roads in question, and that Jim Palmer's Kaiser car had been driven on the Loop Road upon several legitimate errands shortly before the imprints under scrutiny were found.

At the time of the examination of the imprints of the tires at the place on the Loop Road 70 steps northwest of the driveway leading into the churchyard in front of Tempting Church, it was noted that there were "six or seven different shoe tracks" in the Loop Road "where the car had stopped" and "seven or eight different sets of shoe tracks" in an old woods road nearby. Some of these shoeprints were "small and some large" and some were "coming and some going." Two sets, to wit, "a large set"

apparently made by "size 10 or 11 shoes" and a "small set" apparently made by "size 7 shoes," were particularized by witnesses as "going" to the old woods road and as "coming" down the bank of the Loop Road to a point between the tire imprints. "There was no peculiarity about any of these tracks" and "they could have been there a day or two." When incompetent surmises of witnesses are eliminated, it clearly appears from the record that none of the shoe prints in the locality in question could be traced to any place in the woods.

About midnight on 17 March, 1948, peace officers discovered "two sets of tracks, or footprints that were fresh" beside a "head impression and a foot impression" on the bank of Deep River about 50 feet above the spot in the river where the body of the deceased was found three days later. There was no peculiarity in either of these sets of shoeprints, except that one was large and the other was small. These tracks were not traced to the tire imprints at the junction of the Plank Road and the old wagon road some 25 or 30 steps from the river.

The entire evidence adduced by the State with respect to shoeprints was thus summed up by its witness, Deputy Sheriff Odie McBryde: "I have no description or measurements of the tracks we saw at the river except that there was a large step and a small step. There were two large tracks near the log in front of the church, but I did not measure them. I didn't measure any of the lengths or widths of any of the tracks . . . I don't know what kind of shoe made the tracks, but it was not a heavy work shoe. There was no peculiarity about any of these tracks, other than that they were large and small. . . . They were just plain tracks."

Nevertheless, the State presented testimony over objection of the defense that "the track beside that overshoe track" on the bank right across the Loop Road from Tempting Church and the large shoeprints between the tire imprints "where the car stopped" were "made by the same shoe," and that the shoeprints at the river "were the same tracks" as those "seen at the church."

The State offered the testimony of Deputy Sheriff Ralph Matthews to connect Foxy Palmer with the small footprints. He testified over an objection of the defense that he saw Foxy Palmer pulling grass in a cornfield near his home about a week before the deceased disappeared; that at that time he saw a shoeprint, which "appeared to be a No. 7 shoe," in the cornfield near Foxy Palmer; and that the shoeprint in the cornfield and the "small tracks" which subsequently appeared between the tire imprints on the Loop Road "looked to be the same shoe." Foxy Palmer testified that he wore a "No. 7½ or 8 shoe."

Jim Palmer conceded that he wore a "No. 10 shoe." The State undertook to establish that he was the maker of the large shoeprints found between the automobile tracks on the Loop Road "where the car had

stopped" by the evidence of its witnesses Ed Hooker and C. B. Beck, who admitted that these shoeprints had no distinctive features and who were permitted to testify over the objection of the defense. .Hooker was asked this question and returned this answer thereto, namely: "Q. Where, and whose track is it? A, I believe it was Jim Palmer's." The record sets out the evidence of Beck on this phase of the case as follows: "Q. Whose track was it? A. I just could not exactly say (witness looks around courtroom); it was really Mr. Jim's track."

The jury found Jim Palmer "guilty of murder in the first degree in the manner and form as charged in the bill of indictment" and Foxy Palmer "guilty of the felony of accessory after the fact to the crime of murder in the manner and form as charged in the bill of indictment." Under the charge, this verdict constituted an acquittal of Jim Palmer on the indictment charging him with being an accessory. Judgment of death was pronounced against Jim Palmer, and Foxy Palmer was sentenced to imprisonment in the State's Prison. Both of the accused thereupon appealed, assigning errors.

*Attorney-General McMullan and Assistant Attorneys-General Bruton, Rhodes, and Moody for the State.*

*E. L. Gavin, R. L. Gavin, Neill McK. Salmon, and Douglass & McMillan for the prisoner, Jim Palmer, appellant.*

*H. M. Jackson, H. W. Gavin, and D. E. McIver for the defendant, Foxy Palmer, appellant.*

ERVIN, J. The appellants place their chief emphasis in this Court upon their exceptions to the refusal of the trial court to allow their motions for involuntary judgments of nonsuit made when the State rested its case and renewed when all the evidence was concluded.

When the State undertook to prosecute the prisoner, Jim Palmer, for the slaying of the deceased, Otis McNeill, it necessarily assumed the burden of producing evidence sufficient to prove two things: (1) That the deceased died by virtue of a criminal act; and (2) that such criminal act was committed by the prisoner. *S. v. Howell*, 218 N.C. 280, 10 S.E. 2d 815; *S. v. Redman*, 217 N.C. 483, 8 S.E. 2d 623; *S. v. Johnson*, 193 N.C. 701, 138 S.E. 19. Undoubtedly, the testimony of the prosecution was sufficient to establish the first of these propositions.

The defense insists, however, that the indictment for homicide ought to have been nonsuited in the court below for the reason that the State's evidence fails to identify the prisoner, Jim Palmer, as the person who did the killing. Furthermore, the defendant, Foxy Palmer, asserts that the testimony of the prosecution is equally defective in respect to the charge against him in that it fails to show that he participated in the hiding

of the body of the deceased. *S. v. White,* 208 N.C. 537, 181 S.E. 558; *S. v. Simms,* 208 N.C. 459, 181 S.E. 269.

The State was compelled to resort to circumstantial evidence in its effort to connect the prisoner, Jim Palmer, with the homicide, and the defendant, Foxy Palmer, with the concealment of the corpse. In final analysis, this testimony consisted simply of circumstances which tended· to show a motive for the commission of the crimes charged, and evidence of shoeprints and automobile tracks in the vicinity of Tempting Church and Deep River.

Evidence of motive is relevant as a circumstance to identify an accused as the perpetrator of an offense. *S. v. Artis,* 227 N.C. 371, 42 S.E. 2d 409; *S. v. Ham,* 224 N.C. 128, 29 S.E. 2d 449; *S. v. Hudson,* 218 N.C. 219, 10 S.E. 2d 730; *S. v. Lefevers,* 216 N.C. 494, 5 S.E. 2d 552; *S. v. Wilkins,* 158 N.C. 603, 73 S.E. 992; *S. v. Green,* 92 N.C. 779. But such evidence, standing alone, is not sufficient to carry a case to the jury, or to sustain a conviction. 23 C.J.S., Criminal Law, section 1139; 44 C.J.S., Homicide, section 321. Consequently, we must determine whether the State's testimony relating to shoeprints and automobile tracks in the vicinity of Tempting Church and Deep River, either of itself or in combination with the evidence as to motive, reasonably tends to point out the prisoner, Jim Palmer, as the murderer of the deceased, or the defendant, Foxy Palmer, as one who assisted in concealing his corpse. *S. v. Heglar,* 225 N.C. 220, 34 S.E. 2d 76; *S. v. Oldham,* 224 N.C. 415, 30 S.E. 2d 318; *S. v. McLeod,* 198 N.C. 649, 152 S.E. 895; *S. v. Satterfield,* 121 N.C. 558, 28 S.E. 491.

In the nature of things, evidence of shoeprints has no legitimate or logical tendency to identify an accused as the perpetrator of a crime unless the attendant circumstances support this triple inference: (1) That the shoeprints were found at or near the place of the crime; (2) that the shoeprints were made at the time of the crime; and (3) that the shoeprints correspond to shoes worn by the accused at the time of the crime. *S. v. Ragland,* 227 N.C. 162, 41 S.E. 2d 285; *S. v. Walker,* 226 N.C. 458, 38 S.E. 2d 531; *S. v. Mays,* 225 N.C. 486, 35 S.E. 2d 494; *S. v. Cromer,* 222 N.C. 35, 21 S.E. 2d 811; *S. v. Jones,* 215 N.C. 660, 2 S.E. 2d 867; *S. v. McLeod, supra; S. v. Weston,* 197 N.C. 25, 147 S.E. 618; *S. v. Young,* 187 N.C. 698, 122 S.E. 667; *S. v. Griffith,* 185 N.C. 756, 117 S.E. 586; *S. v. Fain,* 177 N.C. 120, 97 S.E. 716; *S. v. Spencer,* 176 N.C. 709, 97 S.E. 155; *S. v. Martin,* 173 N.C. 808, 92 S.E. 597; *S. v. Lowry,* 170 N.C. 730, 87 S.E. 62; *S. v. Thompson,* 161 N.C. 238, 76 S.E. 249; *S. v. Taylor,* 159 N.C. 465, 74 S.E. 914; *S. v. Freeman,* 146 N.C. 615, 60 S.E. 986; *S. v. Hunter,* 143 N.C. 607, 56 S.E. 547; *S. v. Adams,* 138 N.C. 688, 50 S.E. 765; *S. v. Daniels,* 134 N.C. 641, 46 S.E. 743; *S. v. Morris,* 84 N.C. 756; *S. v. Reitz,* 83 N.C. 634; *S. v.*

*Graham,* 74 N.C. 646. Similar criteria apply to evidence of automobile tracks offered to identify the owner of a motor vehicle as the perpetrator of an offense. *S. v. Young, supra.*

Moreover, the bare opinion of a witness that a particular shoeprint is the track of a specified person is without probative force on the question of identification. *S. v. Reitz, supra;* Wharton's Criminal Evidence (11th Ed.), section 934. The great master, Dean Wigmore, had this to say on this phase of the law of evidence: "No doubt a witness to identity of footmarks should be required to specify the features on which he bases his judgment of identity; and then the strength of the inference should depend on the degree of accurate detail to be ascribed to each feature and of the unique distinctiveness to be predicated of the total combination. Testimony not based on such data of appreciable significance should be given no weight." Wigmore on Evidence (3rd Ed.), section 415.

The State's evidence may beget suspicion in imaginative minds. But when it is laid side by side with law and logic, it does not rise to the dignity of proof. It leaves to conjecture the place and time of the homicide, and the relation of the shoeprints and automobile tracks to these all-important matters. It refers to speculation the problem of whether any connection existed between the concealment of the corpse and the tire prints found on roads constantly used by the general public for lawful objects. Likewise, it commits to surmise the question of whether these imprints were made by an automobile belonging to the prisoner, Jim Palmer, or by any one of numberless other motor vehicles equipped with exactly identical tires. Over and above these considerations, it lacks probative force in pointing toward the accused as the makers of the footprints near Tempting Church and beside Deep River. It makes the identity of Jim Palmer as the maker of shoeprints to rest solely on the bare belief of Ed Hooker that one set of "large tracks" without distinctive features observed on the Loop Road on Wednesday night, 17 March, 1948, were Jim Palmer's tracks, and the dubious testimony of C. B. Beck, which reads as follows with the parentheses, the parenthetic phrase "witness looks around courtroom," and the semicolon expunged: "I just could not exactly say it was really Mr. Jim's track." The attempt to connect Foxy Palmer to the shoeprints is based on even more tenuous circumstances.

When all is said, the State's testimony as a whole returns no answers to the baffling questions it asks except these resounding echoes: When, where, and by whose hand was Otis McNeill murdered? Who consigned his body to Deep River? Since the record leaves these crucial matters unsolved and shrouded in mystery, the State must suffer defeat for want of proof.

This brings to remembrance a far-away day in ancient Rome when another prosecution failed for a like reason. The incident is recounted in *Coffin v. United States,* 156 U.S. 432, 15 Sup. Ct. Rep. 394, 39 L. Ed. 481, in these words:

"Ammianus Marcellinus relates an anecdote of the Emperor Julian which illustrates the enforcement of this principle in the Roman law. Numerius, the governor of Narbonensis, was on trial before the Emperor, and, contrary to the usage in criminal cases, the trial was public. Numerius contented himself with denying his guilt, and there was not sufficient proof against him. His adversary, Delphidius, 'a passionate man,' seeing that the failure of the accusation was inevitable, could not restrain himself, and exclaimed, 'Oh, illustrious Caesar! if it is sufficient to deny, what hereafter will become of the guilty?' to which Julian replied, 'If it suffices to accuse, what will become of the innocent?' "

In reaching the conclusion that the testimony did not make a case for the jury, we have neither overlooked nor ignored the evidence of the State which tended to show that on Monday, 22 March, 1948, 17 cotton strings of varying lengths were found in the trunk of Jim Palmer's automobile "on the wood rests which the spare tire lies on," and that these strings and a quilt composed of 36 different fabrics were submitted to the State's witness P. T. Bachinger, an expert in the field of textile goods, who compared the 17 cotton strings with sample strings from each of the 36 fabrics in the quilt and, found that one of the cotton strings taken from the automobile and one of the sample strings from one of the fabrics in the quilt were apparently similar in twist, size, color, and pix. Although this testimony was employed by the State with telling power on the trial in support of its assumption that the body of the deceased was hauled from Tempting Church to Deep River in the trunk of Jim Palmer's automobile, it was incompetent and destitute of probative value because no evidence was adduced by the State tending to identify the quilt submitted to the witness Bachinger as the quilt wrapped about the corpse.

For the reasons given, the convictions and the sentences in the Superior Court are vacated and reversed, and the motions of the appellants for judgments of compulsory nonsuit are sustained on this appeal. Under G.S. 15-173, this ruling has the force and effect of a verdict of not guilty as to each of the accused.

Reversed.