STATE v. CANNADA

[114 N.C. App. 552 (1994)]

STATE OF NORTH CAROLINA v. PHILLIP MANNING CANNADA

No. 9314SC781

(Filed 3 May 1994)

**Homicide § 299 (NCI4th)— second-degree murder—insufficiency of evidence**

The trial court erred by failing to dismiss this second-degree murder case at the close of the evidence because the evidence was insufficient as a matter of law to support defendant's conviction in that there were no eyewitnesses who saw defendant with the murder weapon; there was no physical evidence found at the scene of the crime or on defendant connecting him with the murder; defendant made no out-of-court incriminating statements; and the entire case was circumstantial and speculative, resting solely on evidence suggesting defendant may have had a motive to kill the victim because she wanted to break up with him, and because defendant and the victim had an argument shortly before her death.

**Am Jur 2d, Homicide §§ 425 et seq.**

Judge GREENE dissenting.

Appeal by defendant from judgment entered 29 January 1993 by Judge Robert L. Farmer in Durham County Superior Court. Heard in the Court of Appeals 9 March 1994.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Francis W. Crawley, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Constance H. Everhart, for defendant-appellant.*

JOHNSON, Judge.

Defendant Phillip Manning Cannada was tried and found guilty of the second-degree murder of Teresa Gilmore. Defendant was Ms. Gilmore's live-in boyfriend; Ms. Gilmore's body was found on the floor of the kitchen of her two-story home at 3510 Manford Drive in Durham, North Carolina.

The facts of this appeal are as follows: Sergeant Jodie W. Piatt of the Durham City Police Department received a radio transmission at 8:16 p.m. on 17 September 1991 that a person had been shot at 3510 Manford Drive. He arrived at the home four or five minutes later; the door to the residence was open, and defendant was sitting on the front steps of the residence with a man and a woman. When Sergeant Piatt asked who was shot, he received no response; when he asked for the location of the person who was shot, defendant replied, "in the kitchen." When Sergeant Piatt entered the house he observed a five gallon plastic bucket just inside the living room and three empty shotgun shell casings on the floor of the family room. Ms. Gilmore lay face down on the kitchen floor with a large wound on her upper back. When Sergeant Piatt returned to the front porch he asked defendant his name, his place of residence, and what happened; defendant gave his name, told Sergeant Piatt that he lived there, and then said, "I don't know. I went for a walk and my dove gun was sitting inside on the stool and when I came back she was dead and my gun was gone." When Sergeant Piatt asked what Ms. Gilmore's relationship was to defendant, defendant said, "She's my girl friend or whatever." The police did not find the gun or any persons inside the house. Defendant's wallet was found among clothing at the bottom of steps leading to the lower level of the house; the remaining rooms in the house were clean and in order with no signs of anything being out of place.

Officer Nathaniel S. Parker of the Durham City Police Department, the second officer to arrive, found defendant sitting on the front porch and asked defendant who was shot and what had

happened. Defendant told Officer Parker that "she was shot and that she was in the kitchen." Officer Parker placed defendant in investigative detention, patted defendant down for weapons, and placed him in the back seat of the patrol car. Officer Parker advised defendant of his rights; defendant stated he understood and was willing to answer questions. Officer Parker testified that defendant told him the following: that Ms. Gilmore had picked him up from work that day at 4:00 p.m. and they got home about 5:00 or 5:30 p.m. after stopping to check on another job; that he drank four or five beers; that after they finished dinner at 7:00 or 7:15 p.m., he went for a walk toward Brighton Road and Hope Valley Road, leaving Ms. Gilmore washing dishes; that he was not sure how far he went, but he was gone about an hour; that when he left the house, the gun was lying on a stool next to the bucket at the entrance to the den just inside the front door; that the reason the gun was there was because he had gone dove hunting; and when he left for his walk, the gun was not loaded.

When Officer Parker began writing his report, defendant dozed in the back seat of the patrol car. Officer Parker got out and checked the hood of the white BMW in the driveway; the hood was still warm, indicating it had probably been driven in the last hour or so. When defendant awoke and got out of the car to use the bathroom at a neighbor's house, an unfired buckshot shell rolled to the back seat. When asked where the shell came from, defendant said, "I just picked it up when I walked in the house."

Investigator Alvin Jerome Carter of the Durham City Police Department also spoke to defendant while defendant sat in the patrol car at the scene. Defendant told Investigator Carter he had gone for a walk and came back to find Ms. Gilmore dead and his shotgun missing, and he agreed to go downtown and talk further. Defendant seemed calm and was "nodding in and out" and appeared to be under the influence of drugs or alcohol; once at the police station, defendant fell asleep in the interview room prior to questioning. Defendant said he was willing to talk and that he just wanted to help resolve the matter, that he wanted to "get that SOB" who killed Ms. Gilmore "as bad as anybody else," and that he was 100% willing to cooperate. Because of his appearance, defendant was asked if he had taken any drugs, and defendant did not indicate that he had taken any drugs. However, because defendant appeared to be under the influence of alcohol or drugs, he was asked to submit to a blood alcohol test; the

test results showed a blood alcohol content of .04. Defendant also consented to a paraffin test for gunshot residue and a polygraph test, but these tests were not performed that evening. A few days later, defendant refused to take a polygraph test.

While at the police station, defendant told Investigator Carter that Ms. Gilmore normally picked him up at work at 3:30 p.m. and took him home, but that particular day, she took him to look at another job and they got home around 5:30 p.m.; that she went to a doctor's appointment around 5:30 p.m.; that when she returned, they cooked and ate dinner together; that defendant had a few beers and Ms. Gilmore had a mixed drink; that while Ms. Gilmore cleaned up, defendant went for a walk; that defendant pulled the truck into the driveway and put his tools in the house and then parked the truck in the street; and that he then went for a walk which was approximately one hour and when he came back, he found Ms. Gilmore dead, and his shotgun gone. Defendant further stated that he and Ms. Gilmore had been together for three years, that they rarely argued and it had been a long time since they had argued; that he had never hit her; and that he had gone bird hunting on 15 September 1991 and that was why the gun was in the living room.

After the interview at the police station ended, defendant was taken home by a police officer, and investigator Marty Keith Campbell of the Durham City Police Department staked out the residence. Defendant was dropped off at 2:40 a.m., and approximately ten or fifteen minutes later, defendant came out of the house and went to the back of the BMW. Investigator Campbell heard what sounded like the trunk of the BMW opening and closing. Afterward, defendant went inside the house and the lights went off at about 3:05 a.m. Investigator Campbell observed no other activity until daybreak, at which time he joined an officer in an unmarked car at the corner of Brighton Road and Manford Drive. About forty-five minutes later, defendant pulled up at the corner in a red truck, turned left onto Brighton Road, turned left onto Hope Valley Road, and went down a hill across a bridge where he turned left into a cul-de-sac. The unmarked car followed; defendant was driving about twenty or twenty-five miles an hour; the posted speed limit was thirty-five miles an hour. The truck slowed down in front of one of the houses in the cul-de-sac. Defendant appeared to spot the unmarked car at that time, and drove his vehicle out of the cul-de-sac onto Hope Valley Road, and returned to Manford Drive.

STATE v. CANNADA

[114 N.C. App. 552 (1994)]

On Thursday, 19 September 1991, employees of the City of Durham Water and Sewer Department were working in the area of Hope Valley Road near Dover Road. At the bottom of a hill just before an intersection with Rugby Road, where a small bridge crosses a stream, an employee found a 20-gauge pump shotgun leaning against a tree limb in a wooded area some distance off the roadway past the bridge. The gun was not loaded. The serial number on the gun matched the serial number on the gun box recovered from the residence of Ms. Gilmore. Tests showed the three fired shotgun shells recovered from the residence of Ms. Gilmore had been fired from this weapon. The unfired buckshot shell found in the patrol car was of identical manufacture and load type as the three fired shells, and bore extractor marks identical to those on shells test-fired from the shotgun. This led Agent T. R. Trochum, a State Bureau of Investigation firearms expert, to opine that this shell had been chambered in and then extracted from the shotgun at some time.

Cindy Gilmore Hardy, Ms. Gilmore's daughter, testified that Ms. Gilmore was sixty years old at the time of her death, and that her father, Ms. Gilmore's husband, had committed suicide in 1986. Ms. Gilmore's son, Henry Gilmore, Jr., who lived with Ms. Gilmore, had been a quadriplegic for eight or nine years at the time of Ms. Gilmore's death as the result of an automobile accident. Mr. Gilmore was not in the home the day of the shooting; he had gone into the hospital the previous day for skin grafts. Ms. Gilmore met defendant about a year after her husband's suicide. Defendant was twenty years younger than Ms. Gilmore. Ms. Hardy and her husband did not like defendant because they felt he was free-loading off of Ms. Gilmore. Ms. Hardy stated that defendant was a heavy drinker and would typically be drunk and in bed by 7:30 p.m. Ms. Gilmore had told Ms. Hardy that she was going to leave the BMW to defendant; after buying the truck, Ms. Gilmore told Ms. Hardy she wanted to leave the truck to defendant, and she wanted it in her will that defendant could stay in her house as long as he needed. Until the will was read on 18 September 1991, Ms. Hardy did not know if her mother had made these changes. All of Ms. Gilmore's property was left to Ms. Hardy and her brother.

Dr. Samuel Garten, a close family friend of the Gilmores, testified that he had visited with them about every two weeks for the past couple of years. Dr. Garten saw defendant during these visits and knew he lived with Ms. Gilmore; Dr. Garten testified that the

STATE v. CANNADA

[114 N.C. App. 552 (1994)]

relationship between Ms. Gilmore and defendant seemed fine in the beginning but that in the last two or two and a half months, Ms. Gilmore had talked to Dr. Garten about problems she was having with defendant. During a cook-out which Dr. Garten attended at the house on one occasion, defendant drank so much that he was too drunk to eat when the meal was ready and he went to bed, and Ms. Gilmore told Dr. Garten and her son that she wanted to get defendant out of the house and that she had given him enough chances and that he was not changing but was just staying drunk.

Patricia Carver Hamilton, Ms. Gilmore's close friend, testified that when Ms. Gilmore's relationship with defendant began, Ms. Gilmore cared about defendant, and that several months before her death, Ms. Gilmore told Ms. Hamilton that she was thinking of changing her will and that there was a vehicle she wanted defendant to have if anything happened to her. As the months progressed, however, Ms. Hamilton noticed a change in the relationship. Ms. Gilmore told Ms. Hamilton in phone conversations that defendant worked early and went to bed early and that she was seeing someone else in the evenings after defendant went to bed. This had been going on for about two or three months. Ms. Gilmore told Ms. Hamilton that she was tired of taking care of defendant and her son, and that she wanted to get on with her own personal life.

Michael Eugene Jennings, Jr., a longtime personal friend of the Gilmores, testified that he had several phone conversations with Ms. Gilmore during September 1991; all but one were initiated by Ms. Gilmore. During the last couple of phone calls, Ms. Gilmore sounded upset and told Mr. Jennings she wanted to see him and talk "about a matter" and when Mr. Jennings offered to come over, Ms. Gilmore said, "No, he'll kill you." She added, "He'll kill us both." Mr. Jennings assumed Ms. Gilmore meant defendant, although she never mentioned his name. Ms. Gilmore also said, "I don't really want to get you hurt."

Dr. Joan Marie Stets, a plastic surgeon Ms. Gilmore had been seeing from June through September 1991, testified that when Ms. Gilmore came in for an appointment between 4:00 and 4:30 p.m. on 17 September 1991, Ms. Gilmore told her that she was going to ask defendant to leave her home.

Wayne Thomas Barbee, a self-employed roofer, testified that he was working outside the home of Ms. Gilmore's neighbor, Diane

Higginbotham, on 17 September 1991 around 5:30 p.m., when Ms. Gilmore stopped by and asked him if he would come over and give her an estimate on repairing her roof. A few minutes later, Mr. Barbee went over to speak with Ms. Gilmore, during which time defendant came outside and told Ms. Gilmore she had a telephone call. When Ms. Gilmore asked him to take a message, defendant insisted she go inside and take the call; Mr. Barbee testified that defendant's tone of voice and demeanor were "very hateful" and "very sharp." Ms. Gilmore went inside to take the telephone call while Mr. Barbee went onto the roof to take measurements. Mr. Barbee could hear both voices arguing loudly from inside the house, lasting for about ten minutes. When this stopped, Mr. Barbee knocked at the door and saw Ms. Gilmore inside; although Ms. Gilmore saw him, she gave no response. Mr. Barbee left and approximately fifteen minutes later Ms. Gilmore walked back over and discussed with Mr. Barbee the possibility of repairing the roof the next day. Mr. Barbee then left the neighborhood. This was at approximately 6:30 or 6:45 p.m.

Michael Anthony Coston rented the guest house behind Ms. Gilmore's home. On 17 September 1991, when Mr. Coston came home around 4:30 p.m., defendant and Ms. Gilmore were home. Mr. Coston left to see his girlfriend around 6:00 p.m. and returned close to dark. When he came back to his house, he saw defendant, who told him Ms. Gilmore had been shot.

Diane Higginbotham, Ms. Gilmore's neighbor who lived across the street, testified that she was in her yard watering her flowers from approximately 7:30 to 7:50 p.m. the night of the shooting. She observed defendant walking up his driveway toward his truck, and spoke to him; defendant was dressed in shorts and a t-shirt and was barefoot; his hair looked greasy or wet and he looked pale. During the time she was outside, Ms. Higginbotham did not see the BMW leave.

Margaret H. Wolfe, a neighbor who lived across the street, testified that she was sitting on her front stoop smoking a cigarette at approximately 7:50 p.m. that evening when Ms. Gilmore's BMW came "barreling" out of the driveway, then went up the road very fast. Ms. Wolfe did not see who was driving.

Mary Alice and John Harris, Ms. Gilmore's next-door neighbors, took their grandson for a walk around the neighborhood from about 7:10 to 7:50 p.m. that same evening. They did not notice anything

unusual at the Gilmore residence when they returned. Mr. and Mrs. Harris, as well as Ms. Wolfe, Ms. Higginbotham, and Mr. Coston all testified that they had never seen defendant take a walk anywhere in the neighborhood during the time he lived there.

Defendant did not present any evidence at trial. After being convicted of second-degree murder, defendant filed notice of appeal to this Court.

Defendant argues that the trial court erred by denying defendant's motion to dismiss at the close of the evidence because the evidence was insufficient, as a matter of law, to support defendant's conviction for second-degree murder. Defendant argues that the State's case must fail because there was no substantial evidence to link defendant to the offense or to raise more than a suspicion or conjecture that defendant was the person responsible for Ms. Gilmore's death.

"Second-degree murder is defined as the unlawful killing of a human being with malice but without premeditation and deliberation." *State v. Phipps*, 331 N.C. 427, 457-58, 418 S.E.2d 178, 194 (1992). *See also State v. Young*, 324 N.C. 489, 380 S.E.2d 94 (1989). "In any prosecution for a homicide the State must prove two things: (1) that the deceased died by virtue of a criminal act; and (2) that the act was committed by the defendant." *State v. Jones*, 280 N.C. 60, 66, 184 S.E.2d 862, 866 (1971); *State v. Palmer*, 230 N.C. 205, 52 S.E.2d 908 (1949).

We believe the State has failed to prove by substantial evidence that the murder herein was committed by defendant. The evidence presented herein "merely shows it possible for the fact in issue to be as alleged, [raising] a mere conjecture that it was so . . . [and] should not be left to the jury." *State v. Lee*, 287 N.C. 536, 540, 215 S.E.2d 146, 149 (1975), *quoting State v. Vinson*, 63 N.C. 335, 338 (1869).

We note that there were no eyewitnesses to the shooting; that there were no eyewitnesses who saw defendant with the murder weapon; that there was no physical evidence found at the scene of the crime or on defendant connecting him with the murder; that defendant made no out-of-court incriminating statements; and that the entire case was circumstantial and speculative, resting solely on evidence suggesting defendant may have had a motive to kill Ms. Gilmore because she wanted to break up with him,

STATE v. CANNADA

[114 N.C. App. 552 (1994)]

and because defendant and Ms. Gilmore had an argument shortly before her death. As such, we find the trial court erred by failing to dismiss this case at the close of the evidence because the evidence was insufficient, as a matter of law, to support defendant's conviction for second-degree murder. *See State v. Jones*, 280 N.C. 60, 184 S.E.2d 862 (1971) (where the evidence was insufficient to show the defendant killed his wife where the wife was seen with the defendant in their store the evening of the murder and the wife's body was later found in the store; the evidence indicated the defendant was drunk and violent that evening; the defendant was found with ammunition in his pocket; and the defendant had blood spots on his jacket matching the blood type of the victim and himself); *State v. Cutler*, 271 N.C. 379, 156 S.E.2d 679 (1967) (where the evidence was insufficient to show the defendant committed murder where the victim was stabbed to death; the defendant had been seen driving to the victim's house twice the day of the murder and his truck was parked in the victim's yard; the defendant had a knife which was bloody and had hair on it similar to the hair of the deceased and the defendant claimed the deceased had committed suicide); *State v. Lee*, 287 N.C. 536, 215 S.E.2d 146 (1975); *State v. Furr*, 292 N.C. 711, 235 S.E.2d 193, *cert. denied*, 434 U.S. 924, 54 L.Ed.2d 281 (1977).

In that we vacate on this issue, we need not address defendant's remaining assignments of error.

Vacate.

Judge JOHN concurs.

Judge GREENE dissents.

Judge GREENE dissenting.

I disagree with the majority that there is not substantial evidence in this record to support submitting this case to the jury.

The evidence reveals that the victim and the defendant, who were not married, lived together in a house owned by the victim. The victim had expressed her desire that after her death defendant have her truck and be allowed to live in her house as long as he needed. In the several months preceding her death, however, she had changed her mind, telling several people that she wanted defendant to move out of her residence. On the day she was killed,

STATE v. CANNADA

[114 N.C. App. 552 (1994)]

the victim told Dr. Joan Stets that she was going to ask defendant to leave her home. At one point, she told a friend not to come to her house because "he'll kill both of us."

About 5:30 p.m. on the evening of the killing, the victim and the defendant, who had been drinking, were overheard arguing loudly with each other inside the victim's house. The victim was last seen alive around 6:30 p.m. The defendant was seen around 7:30 p.m., dressed in a t-shirt and shorts and barefooted, walking from the house to the truck which was parked in the street in front of the victim's house. At 7:50 p.m., the victim's BMW, which had been parked in the victim's driveway, was seen barreling from the house and down the street. No one saw the defendant walking in the neighborhood on the evening of the killing nor had defendant ever been seen walking in the neighborhood.

When the police arrived at the victim's residence at 8:20 p.m., they found the defendant sitting barefooted on the front porch of the house, and the BMW in the driveway. The victim was found lying on the kitchen floor and no gun was found in the house. The defendant told the police that he did not know what had happened as he had been out walking for about an hour and on his return found his gun missing and the victim dead on the floor. He also told the police that it had been a long time since he and the victim had argued. Upon questioning the defendant in one of the patrol cars, an unfired shotgun shell, which was later determined had been chambered in the gun which had killed the victim, fell from the defendant's pocket. The gun was found several days later near a road not far from the victim's residence, at a place where the defendant was seen, the day after the killing, driving by very slowly.

This evidence, although circumstantial, is such that a reasonable mind could accept it as adequate to support the conclusion that defendant unlawfully killed Teresa Gilmore (the victim) with malice, and that conclusion supports the verdict of guilty of second degree murder. *See State v. Smith*, 300 N.C. 71, 78, 265 S.E.2d 164, 169 (1980) ("Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."). Accordingly, I believe the trial court correctly denied the defendant's motion to dismiss the charges, and because I do not see any other error that requires a new trial, I vote to affirm the conviction.