### *THE STATE v. JOHN BRACKVILLE.

#### *Homicide—Evidence.*

The deceased, an aged and helpless man, was taken from his house in the afternoon into the woods and brutally murdered, the body being concealed and not found until the following day. The prisoner, who resided in the same house, was shown to have some feeling against deceased, and to have expressed some vague threats toward him. It also appeared that the prisoner was seen at the house a short time before deceased disappeared, and in the vicinity shortly afterwards, and that the tracks leading to the place of the homicide resembled his. It further appeared that on the evening of the homicide and the day following he was restless and anxious, and expressed a purpose to leave the country, but made no effort to do so. There was evidence that other persons were also at deceased's house shortly before his disappearance, and were in the neighborhood near by that night and following day: *Held,* that while this evidence was sufficient to arouse a strong suspicion of prisoner's guilt, it was not inconsistent with his innocence, and left the matter in such doubt the Court should have instructed the jury to acquit.

This was an INDICTMENT for murder, tried at Fall Term, 1884, of RICHMOND Superior Court, before *Shepherd, J.*

The prisoner (and one Amy McNair, who was acquitted,) was indicted for the murder of one Charles McNair.

The testimony was as follows:

Willis Leach, for the State, testified: "Charles McNair was missing on a Friday night in October, 1884. On Friday evening I was going by his house. I noticed that everything was very still. John Brackville came to the door. McNair was lying at the other door on a pallet. I stopped and sat down. I saw Lou Hall coming; she came in and said, 'John, what are you doing here?' John said, 'I came for some tobacco.' Lou said, 'It is strange you came for tobacco, when you know you have none here.' John

---

*The prisoner escaped from jail while his appeal was pending in this Court. It was thereupon dropped from the docket, and afterwards reinstated upon his recapture.

then went out and commenced talking to himself. I had started to hunt some grapes in the woods, and left the house for that purpose between the hours of 12 M. and 1 P. M. I told Lou to come also. She said she would as soon as she heard me cutting in the woods. She soon joined me, and we got some grapes; we then returned to McNair's house, where we found John Brackville and Dave Morrison. This was between 2 and 3 o'clock. Very soon Dave started off. I followed, and left Lou and John Brackville with Charles McNair. McNair was an old man and had been burned. He could not walk without a stick. Next morning (Saturday) I heard that Charles was gone. I went to the house; Amy was there (Charles' wife). I asked her where Charles was. She said, ' Here is his pallet, stick and hat, but I don't know where he is.' I then went around the house and found a track about fifteen steps off. I asked her to come and look at it. She said it was no good; that I knew it was not his track. I then started home, and met Lou Hall; she was going after a warrant; we returned to Charles' house. We found a track on the other side of the fence. It led to a place about four steps from the road, where there was blood. There was signs of the body having been dragged from the spot to some distance further in the woods, where there was blood. We then went further on. About one hundred or one hundred and seventy-five yards from the first spot, and there we found the body of Charles McNair. He was dead. His skull was crushed and his forehead broken in with what I thought must have been an axe. I saw tracks leading to where Charles was killed. They were the same that were in the field that Charles' house was in. John Brackville, Amy McNair and Lou Hall all lived in the house with Charles McNair."

Henry Monroe testified: " I saw the dead body of Charles McNair about 1 o'clock Saturday. It was lying behind a log in the woods; head was mashed with the back of an axe; forehead and skull also broken in. It looked as if he

had been moved twice, by the blood near the road and further in the wood, and had been dragged to where we found him. I heard Amy say, in August, that she wished Charles was dead. Charles McNair was an old man. John Brackville moved to the house about five months before the missing of Charles. The Saturday evening after Charles was missing, Amy came to my house. My daughter said to her: 'You needn't come here hunting Uncle Charles; you know you have killed him and thrown him into a well somewhere" Amy said: 'I knew I would hear the devil when I got here,' and got up and started off. I asked her when she had seen Charles last? She said: 'I haven't seen him since yesterday (Friday) morning.' I asked her why she was so contented about his missing? She said: 'I would have been hunting him before but thought some of his folks had taken him off.' On Friday night after the missing I went to Charles' house. The doors were shut and no one there. I went to the mill, between a quarter and a half a mile from the house, and found Amy near there, at Eliza Morrison's house. I heard her laughing. I took her off to myself. I told her about her husband being missed. She said he couldn't walk. She denied having had any quarrel with him, but afterwards said she had had a little falling out with him on Thursday, but that it did not amount to anything. We all went to Charles' house. I suggested that he might be in the well, and that it be examined. Amy said she would not go and look into the well unless Lawrence went. Amy seemed jolly when she went from Eliza's to her house. At the well one of the party said: 'I have got him,' and Amy cried until it was discovered that it was only the well-bucket. I then told her I was going to arrest her. She said: 'I am not going to leave the place where my husband was murdered.' I went to get a warrant and when I returned Lou Hall and John Brackville had come up. I asked John where Charles was.

He said he didn't know. Lou said: 'What the devil does all this mean?' I said: 'You may consider yourself under arrest until Charles is found.' Lou and John said they would not be arrested."

Lou Hall testified: "I was living in the same house with Charles McNair, John Brackville and Amy. On Friday morning I left the house between 8 and 9 o'clock and went to the mill. Amy went with me. We left Charles alone. John Brackville had left that morning before sunrise for the mill; we went to carry his breakfast and dinner. I returned to Charles' house about 12 o'clock in the day. I left Amy at Eliz Morrison's house, near the mill. When I reached Charles' I found Willis Leach there. I staid until 3 o'clock. After that I had gone in the woods for grapes. Amy had not come. John was there when I got there. He said he had come after some tobacco. I said: 'It looks queer for you to come for it when you know you have none here.' Willis Leach got up and asked Charles for his axe; said he wanted to go in the woods and get some wild grapes. I said I would join him when I heard him cutting. Soon I joined him. When I spoke to John Brackville about the tobacco he seemed mad; went off saying he 'would fix things better than so.' When I went after the grapes I left Charles alone. When I returned I saw John returning again from the direction of the mill. He hadn't had time to go to the mill. He came in the house and looked angry at Charles. Charles raised up on his pallet and said to him: 'I know you are angry, and I am going to tell this gal how you have been talking about her, and how you have been saying that you did not intend to pay her for what she has done for you.' John was eating. He threw his bread down and said: 'What in the devil have you got to do with it?' He shook his fist in Charles' face and said: 'By the living Jesus, you have got to attend to your own business; I am going to make you attend to

your business.' About 3 o'clock I left and John Brackville followed me as far as the hedge-row. He said: 'If Charles has told you what I said, and you believe it, Charles won't get a chance to tell you any more.' He went back in the direction of Charles' house. I left no one with Charles. About a quarter of an hour after sunset, I returned to the house; both doors were open and no one there. The axe which Willis had returned was gone; my clothes gone, and John's satchel and best pants gone. Charles' stick was there. I called him and there was no response. I then went to the mill and found Amy at Eliza's. I asked her where Charles was. She said she did not know. She didn't seem interested; said John Brackville had been that course twice. She asked if John wasn't there. It had been two months since Amy had staid away from her house that late, and five months before John Brackville had ever staid out at night. Amy went home with me. I saw John that night at Archie Shaw's shanty. I told him about Charles and the clothes being missed. He said: 'Well, I reckon not; I can't say about Charles, but I reckon my clothes are there.' I saw a track Friday night at the place near the road where Charles was reputed to have been killed. It led by the field back towards the house. The track went to Charles.' It was John Brackville's track. I so told Willis Leach next morning. On Friday morning, I told Amy to go dress Charles' leg. She walked to him, snatched the blanket from him and abused him for being nasty, and said: 'Damn your nasty soul, if you don't quit spitting on the floor, and quit your nastiness, I will kill you, or have you killed.' I remonstrated. She said: 'Lou, nobody knows what trouble I have with this bald-headed son-of-a-bitch but me.' We never found the axe. I did not measure this track. In the line of this track I found a spool of my thread, which I had left in the house; it was unwound a part of the way along the track."

106—45

Willis Leach, recalled, said: "On Sunday morning, after the missing of Charles, Lou Hall showed me the tracks, and they were John Brackville's."

Charles H. Daniel testified: "I was living at McMillan's mill, a quarter of a mile from Charles McNair's. On the Friday night of the missing of Charles, I went to bed between nine and ten o'clock. After I went to bed, John Brackville came to the shanty. John used to stay there, but had not staid there at night for five months. He shoved the door open, sat on a box, and asked if we had anything to eat. He ate something, then sat down on the box again, and leaned his face on one of his hands. He appeared worried. Shaw said, 'What have you lost?' He said, 'I have lost my valise and pants,' and that 'Lou Hall had lost some of her things.' When he put his hand to his face he said, 'Great God, boys! I am going to leave this country.' He never said a word about Charles."

James L. Haley testified: "John Brackville and Dave Cromartee were working at the mill. I wanted hands to pack cotton. On Friday morning (of the day of the missing of Charles) they packed one bale. When I was about to drive off, I saw John, Lou Hall and Amy in the road talking about something. On Saturday morning John came to me and wanted a settlement. I said, 'I have no money with me,' but could pay him if he went to Laurinburg. He appeared very uneasy."

David Cromartee testified: "John Brackville and I were working at the mill together on the Friday of the missing of Charles McNair. About 11 A. M. I went to Eliza Morrison's house; when I returned John was gone; he came in about an hour; then he wheeled dirt awhile, and said he would go and get his dinner, and he went off. This was about half-past two o'clock. I never saw him any more until after night. I staid half an hour after he left."

Here the State closed its testimony.

Amy McNair was introduced in her own behalf, and testified as follows: "On Friday morning I went after meal to the mill between 9 and 10 o'clock. Lou Hall went with me. She carried John Brackville's breakfast with her, but no dinner. I went to Eliza Morrison's, near the mill. I never left there until Lou came after me, about supper time, and then I went home. I never had anything to do with the killing of Charles, nor did I know anything about it. That night after I got home, Lou and I hunted for Charles nearly all night. The reason I staid away from home was because I wanted to borrow some meal from Lou Hayes. About dinner time I told Dave Morrison, who was going by home, to tell Charles I would be home after awhile. Before I left Eliza's John Brackville passed, just about dark, with his pipe. Then Lou and I went home After awhile we returned past the shanty of the Bladen boys. I saw John there. Archie Shaw was there also. We then returned home. John Brackville came afterwards. About one quarter of an hour after we got home, John Brackville said: 'Do you want me to help look for him?' I told him there was no use asking me that question; he might know I wanted him to do so. Shortly afterwards Brackville went away."

Eliza Morrison testified: "I saw Amy at 12 o'clock of the Friday of the missing of Charles. She staid at my house until Lou Hall came. They went off soon after Lou Hall came. John Brackville passed a little before Lou came, between sunset and dark."

Monroe Cox, witness for the State, testified: "Amy's general character is bad. He heard Amy say, in April, that she was tired of Charles, and that she 'wished he was dead and out of her way.'"

The prisoner asked the Court to instruct the jury that there was not sufficient testimony to convict him, and that they should return a verdict of "not guilty." The Court

declined to so instruct the jury, and the defendant excepted. There was no other exception during the trial.

There was a verdict of "not guilty" as to Amy, and a verdict of "guilty" as to John Brackville.

The prisoner moved for a new trial, because of the failure of the Court to instruct the jury according to his prayer.

The motion was overruled, and the Court pronounced the sentence of death. The defendant prayed an appeal to the Supreme Court.

The prisoner escaped from the jail while his appeal was pending. The case was not carried forward upon the docket, but was reinstated upon his recapture. (See 91 N. C., 945, 972.)

*The Attorney General*, for the State.
No counsel *contra*.

MERRIMON, C. J.: Competent evidence, sufficient in pertinency and force in some reasonable view of it to be taken by the jury to warrant them in finding a verdict of guilty, must be submitted to them on the trial of the issue of fact ra sed by the plea of not guilty in a criminal action. Such evidence must be produced, else there cannot be a lawful verdict of guilty. It is the province and duty of the Court to determine that such evidence is, or is not, produced on the trial, when any question in that respect is raised. It is the province of the jury to determine when such evidence is so produced, that it is true or not true, in whole or in part, and its weight and sufficiency or insufficiency to induce them to render a verdict of guilty. What is evidence is a question for the Court. Whether evidence is true or not, and what is its weight, are questions ordinarily for the jury. *State* v. *White*, 89 N. C., 462, and cases there cited; *State* v. *James*, 90 N. C., 702; *State* v. *Atkinson*, 93 N. C., 519; *State* v. *Powell*, 94 N. C., 965.

In the present case, the evidence produced on the trial was strong and abundantly sufficient to go to the jury to prove that the deceased was brutally murdered by some person; but, in our judgment, it was not sufficient to go to them to prove that the prisoner was the guilty party. It tended to show that the prisoner had motive, but not very strong; that he made threats—indefinite, but rather suggestive that he might kill the deceased; that he had opportunity to kill him; that others had like and as great opportunity; that his tracks were seen by one witness as if he were going from the place where the body of the deceased was found towards the house from which he was taken, but this evidence was not definite or satisfactory. So far as appears, the tracks were not scrutinized—they were not measured—the prisoner's feet were not measured or fitted to the tracks, nor did it appear that his feet were at all peculiar in any respect, nor did the witness say how she knew the tracks were his. On the night of the homicide, probably shortly after it was committed, the prisoner was in a cabin with several other persons, and appeared to be uneasy and anxious, and exclaimed, without apparent cause, "Great God! boys, I'm going to leave this country." He gave no reason for this exclamation. The next morning he demanded the wages due to him from his employer, and seemed anxious. But he did not fly. There was other evidence in connection with that referred to, going to prove that the wife of the deceased was tired of him—wished he was dead; that she was a dissolute woman and of bad character. It did not appear that the prisoner was her paramour, or that there was undue intimacy between them. It may be that some person other than the prisoner, at her instance, or on her account, murdered the deceased. Indeed, she was charged in this action as a participant in the murder, and she was not at all free from suspicion.

We think the evidence simply raised strong suspicion of the prisoner's guilt. It could not, in any reasonable view of it, prove his guilt. Taking the strongest view of it adverse to him, upon serious reflection, it leaves the mind in a state of painful anxiety, doubt and uncertainty as to his guilt. The evidence giving rise to suspicion, accepted as true, was far from conclusive. Leaving out the evidence as to the tracks, the leading facts, whether taken severally or collectively and in their combined force, were not necessarily inconsistent with his innocence. As we have seen, the evidence as to the tracks was very unsatisfactory. It seems that it might and ought to have been made much clearer, especially, as it was very material.

Circumstantial evidence is not only a recognized and accepted instrumentality in the ascertainment of truth, but it is essential, and, when properly understood and applied, highly satisfactory in matters of the gravest moment. The facts, their relations, connections and combinations should be natural, reasonable, clear and satisfactory. When such evidence is relied upon to convict, it should be clear, convincing and conclusive in its connections and combinations, excluding all rational doubt as to the prisoner's guilt; and it is not sufficient to go or be left to the jury, unless, in some aspect of it, they might reasonably render a verdict of guilty. *State* v *Swink*, 2 Dev. & Bat., 9; *State* v. *Long*, 7 Jones, 24; *State* v. *Matthews*, 6'5 N. C., 106; *State* v. *Bowman*, 80 N. C., 432; *State* v. *Freeman*, 89 N. C., 469; *State* v. *James*, 90 N. C., 702.

Error.