STATE v. EMORY JOSEPH ROUX ALIAS DAVID WILLARD.

(Filed 2 March, 1966.)

**1. Criminal Law § 99—**

Upon motion to nonsuit in a criminal action, the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable intendment thereon and to every reasonable inference to be drawn therefrom.

**2. Criminal Law § 101—**

The sufficiency of circumstantial evidence to be submitted to the jury is a question of law for the court to be determined upon the basis of whether there is substantial evidence of all material elements of the offense charged, it being the province of the jury to determine if the circumstantial evidence is such as to exclude every reasonable hypothesis except that of defendant's guilt.

**3. Larceny § 7; Burglary and Unlawful Breakings § 4— Circumstantial evidence held sufficient to be submitted to the jury on the question of guilt.**

The State's evidence tended to show that a jewelry store in a particular municipality had been broken into and cash and jewelry stolen therefrom. The circumstantial evidence tended to show that money taken from the store had peculiar markings and that money with such markings was found on defendant's person after the offense, that tire tracks at the scene matched the tires of defendant's vehicle, that defendant stayed at a nearby motel at the time the offense was committed, and that a matchbook from this motel was left at the scene of the crime, etc. *Held:* The evidence is sufficient to be submitted to the jury on the question of defendant's identity as the perpetrator of the offense of larceny and feloniously breaking and entering.

**4. Criminal Law § 111—**

It is not prejudicial error for the trial court to fail to charge the jury that it should scrutinize the testimony of accomplices when defendant's counsel makes no request for special instructions upon this subordinate feature.

MOORE, J., not sitting.

APPEAL by defendant from *Fountain, J.,* October 1959 Term of PITT.

Criminal prosecution on two indictments: The first indictment charges defendant with the larceny on 25 October 1958 of money, diamonds, rings, and Hamilton and Tissot watches and other brands of watches, all of the value of $28,000, the property of, and owned by George Lautares, John Lautares, and Pearl Lautares; the second indictment charges defendant on the same day and at the same place with feloniously breaking and entering a shop and building then occupied by George Lautares, John Lautares, and Pearl Lautares,

partners trading under the name of Lautares Brothers Jewelers, with intent to commit larceny of their personal property therein, and with attempting to open and with opening a vault, safe, and other secure places therein by the use of nitroglycerine, dynamite, gunpowder, and other explosives, and by an acetylene torch, a violation of G.S. 14-57.

By consent of defendant and the State, the two cases were consolidated for trial. Defendant was represented by Frazier Woolard, a member of the Beaufort County Bar, a lawyer employed by him. Defendant pleaded not guilty in both cases. Verdict: "Guilty as charged in both cases."

From a judgment of imprisonment in each case, to run concurrently, defendant appealed. At the November 1959 Term defendant in open court signed a statement withdrawing his appeal, and thereupon an order was entered by the presiding judge dismissing his appeal. At the October 1963 Term defendant filed with the Superior Court of Pitt County a petition seeking a review of the constitutionality of his trial at the October 1959 Term. Judge Hubbard, who heard his petition, denied defendant any relief. We issued a *certiorari* to review Judge Hubbard's final judgment. Our decision is set forth in *S. v. Roux,* 263 N.C. 149, 139 S.E. 2d 189. In our decision we found error in Judge Hubbard's judgment, and directed that defendant's court-appointed counsel, Milton C. Williamson, perfect with all reasonable promptness an appeal for defendant, an indigent person, from the judgments pronounced against him at the October 1959 Term, so that defendant can have an adequate and effective review by this Court of his trial at the October 1959 Term. All of this is set forth with particularity in our former decision and need not be repeated here.

*Attorney General T. W. Bruton and Deputy Attorney General Harry W. McGalliard for the State.*
*Milton C. Williamson for defendant appellant.*

PARKER, C.J. In the record before us the State's evidence begins on page 5 and ends on page 73. It consists of the testimony of 28 witnesses. Defendant offered no evidence. Judge Fountain's charge to the jury is set forth in 24 pages of the record. The case on appeal was agreed to by counsel. It seems manifest from reading the evidence and the judge's charge as set forth in the record that defendant's counsel and also the solicitor for the State had a full and complete trial transcript of the entire trial as taken down by the court reporter in the preparation of the case on appeal.

Defendant assigns as error the denial of his motion for a judgment of compulsory nonsuit made at the close of the State's evidence. It is hornbook law in this jurisdiction that in considering a motion to nonsuit in a criminal action the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable intendment thereon and every reasonable inference to be drawn therefrom. 1 Strong's N. C. Index, Criminal Law, § 99, and same section in his Supplement to Vol. 1.

The State's evidence shows the following facts: On Saturday, 25 October 1958, and prior to and subsequent to that date, John Lautares, his brother George Lautares, and their mother Pearl Lautares owned and operated as partners a retail jewelry business under the trade name of "Lautares Brothers Jewelers" at 414 Evans Street, Greenville, North Carolina. Their store fronts on Evans Street, and at the rear of the store is an alley. On the night of 25 October 1958 they owned and had in this store a large stock of mounted and unmounted diamonds, other precious stones, rings, watches, bracelets, a large number of different types of jewelry like brooches, etc., silverware, crystal, chinaware, about $1800 in money, checks received from customers, and also had in their possession watches and other jewelry received from customers for repair work. In the course of their business they accumulated gold filings and small pieces of gold cut from repairing rings, etc., and gold dust, and other pieces of old gold which were kept in a small tin can in an iron safe in the rear of their store. John Lautares kept an inventory of the watches and gold in the store, and his brother George kept an inventory of the diamonds. On the night of 25 October 1958 there was in one compartment in the safe an envelope containing twelve $100 bills, and in another compartment one $100 bill, and in another compartment $400 or $500 in five, ten, and twenty dollar bills, placed there by George Lautares, and there was also in this safe watches in envelopes left for repair by customers. The twelve $100 bills were paid to George Lautares by a customer as the purchase price of a ring. One of these $100 bills had a turned-down corner; and another one of these $100 bills had on it the Great Seal of the United States different from any Great Seal of the United States George Lautares had ever seen on a bill. About 9:15 p.m. on 25 October 1958 John Lautares opened the door of the safe and put in it their diamonds, diamond watches, diamond jewelry, and other valuable articles of jewelry, locked the safe door, spun the dial two or three times, turned the lights off in the window of the store, and left for home. When he left the front and back doors of the store were locked and bolted, and the windows at the back of the store were down and fastened securely.

Later on that night a forcible breaking and entry was made into the store by a window or door in the rear. About 9:30 a.m. on 26 October 1958 John Lautares went back to his store. At that time the outside plate on the back of the safe had been cut off, and its inside plate had been cut and ripped off, and the back of the safe was open. Back of the safe were two tanks of oxygen, an acetylene cutting torch hooked up and in operating condition, an extra cutting torch, a sledge hammer, machinist hammers, a crowbar, wrenches, a punch, a drill, a pair of regular work gloves, a cap, a gas mask, a quantity of adhesive tape, and a tarpaulin in the rear of the safe covering the back window "to cut out the glare." Around the safe was a large quantity of empty watch boxes and empty envelopes of a type used by jewelers, and also the ripped-open envelopes which had contained watches left by customers for repair. Around the safe was a book of matches having on the back "Gault's Motor Court and Restaurant; a nice place for nice people; 10 miles north of New Bern; air conditioning, television, Highway #17; phone Vanceboro 120." About three-fourths of the matches had been ignited, but were still in the book. The diamonds, watches, jewelry, money, and the accumulated gold filings and small pieces of old gold, and watches left by customers for repair, which had been in the safe, had been stolen and carried away. The tin can holding the gold filings and small pieces of old gold was left and not carried away. Among the watches stolen from the safe was "a Tissot," an Omega ladies' watch with two diamonds on each side, which the Lautareses purchased from Norman M. Morris Corporation on 17 September 1957. The number on this watch is A-7668. The Norman M. Morris Corporation is the distributor of Omega watches. The customers' checks in the safe were not taken. Cigarette lighters, cuff links, and sterling silver were stolen from the show cases; inexpensive watches and jewelry and costume jewelry were not taken. The most valuable single piece of jewelry stolen was a diamond bracelet of the value of $1,500. The value of the property stolen was about $28,000. The articles stolen would weigh between 15 and 20 pounds, and could be carried away in a small bag or box. Of the watches stolen 50 could be carried away in a man's hand. The inventories kept by the Lautareses enabled them to determine the articles stolen. No book of matches bearing the name "Gault's Motor Court" was in or near the safe when the store was closed on the night of 25 October 1958.

Gault's Motor Court is situate about 32 miles south of the city of Greenville and 10 miles north of the city of New Bern.

William Thomas Alligood, who lives in Washington, North Carolina, has known defendant about four years. He knew him by the

name of Emory Joseph Roux, and he has known that the name David Willard was connected with him. In October 1958 defendant came to his house, and during a conversation between them defendant asked him would he be willing to get a room for him at Gault's motel, and if he would defendant would pay him $100. He agreed to do as defendant requested. Alligood, recalled as a State's witness, testified as follows: "He offered me $100. Roux spent the night at my house Wednesday and he took me to work the next morning, which was Thursday morning. That was when the conversation about the $100 took place. He said he had a job to do, and he said that he had someone to go with him, but that if I could get him the room that he would keep me in mind on jobs after that one."

Clarence Gault, who operated Gault's motel, testified in substance: On the night of Thursday, 23 October 1958, a man, who gave his name as David Willard, came into his motel, registered as a guest by that name, and was assigned room No. 10. He gave the license number of his Ford automobile as Nevada C 35117. About 11:45 p.m. on 24 October 1958 the same man came to his motel, registered for the night, and was assigned a room. That was the last time he saw this man. On Saturday night, 25 October 1958, he had registered in his motel a man by the name of Thomas Alligood. He was shown State's Exhibit No. 16, which is the book of matches bearing the name of his motel, which was found near the broken-open safe of Lautares Brothers Jewelers. He purchased such matches bearing the name of his motel and placed them in the motel's rooms for advertising purposes, and did so during the month of October 1958.

On Saturday night, 25 October 1958, William Thomas Alligood and his brother Daniel came to Gault's motel. Daniel went in and rented a room, signing the register "Thomas Alligood," and paid for it. Then Thomas and Daniel went into the room. Thomas Alligood had an understanding with defendant that defendant would know what room he was in at Gault's motel by reason of the fact that he told defendant he would park his automobile in front of the room. A short time after they had entered this room, about 11:15 p.m., defendant, accompanied by a man Thomas Alligood did not recognize, came into the room. Defendant and this man who accompanied him into the room engaged in a whispered conversation. Thomas Alligood heard just these words of the conversation uttered by defendant: "Greenville" and "a jewelry store." Between 11:30 and 11:45 p.m. defendant and the man who came with him left the room. About 8:30 a.m. the following morning defendant and this man came back to the room in Gault's motel where Thomas and Daniel Alligood were. When defendant came back into the room, he was

carrying a brief case and a leather bag. Defendant made the following statement: "He said that everything was all right and that he had the darndest luck. When he had checked this place, the light was out and on this night it was on. He made a statement about a man by the name of Big Henry. Something about the jewelry and Big Henry in Providence, Rhode Island." About fifteen minutes thereafter Thomas and Daniel Alligood left the room, leaving defendant and the man with him in the room. Defendant was driving a Ford automobile which had a Nevada State license. On the following Friday, Thomas Alligood saw defendant at a filling station in Washington, North Carolina. Defendant said he had gone to Providence, Rhode Island, and had seen Big Henry. Thomas Alligood had served several prison sentences, and was out on parole at the time.

Just across the alley, about 50 or 60 feet from the rear of the store of Lautares Brothers Jewelers, is a regular street lamp. On the night of Thursday, 23 October 1958, this street light was not burning. John A. Briley of the Greenville police force reported to the desk sergeant that this light was out. The next day, 24 October 1958, Frank Hardee, an employee of the Greenville Utilities, replaced the bulb and socket in this light so that the light would burn.

As a result of information received by them, the police force of Washington, North Carolina, were on the lookout for a Ford automobile bearing a Nevada license plate No. C 35117 and a man by the name of Emory Joseph Roux or David Willard. About 12:30 p.m. on 1 November 1958 James Gillgo of the Washington police department saw a Ford automobile bearing this Nevada license tag parked in front of the Colonial Store on Market Street in Washington. Gillgo got out of the car in which he was riding, and directed the officer driving it to go to police headquarters, and tell the chief of police that he had located this car. Gillgo walked across the street to the driveway at the Colonial Store, and stood there as if he were observing traffic. In about five minutes defendant passed Gillgo, crossed the street to his automobile, put his brief case in the automobile, and got in it on the driver's side. Gillgo walked to him and told him he wanted to check his driver's license. Defendant at that time gave him a driver's license issued to a David L. Willard. Gillgo asked defendant if that was the only license he had, and defendant said it was. At that time the chief of police and officer Miller came up in a police car, and defendant was carried to the police station. The chief of police drove defendant's car to the police station. Defendant had in his pocketbook on his person twelve $100 bills and a number of five, ten, and twenty dollar bills. One

of these $100 bills had a turned-down corner; and another one of these $100 bills, to wit, $100 bill on the Federal Reserve Bank of New York, bearing the number BOO, 362919-A, had the Great Seal of the United States different from the Great Seal of the United States on the other $100 bills. Gillgo asked defendant if he would grant him permission to search his automobile. Defendant replied, "You have me; I don't see why you can't go ahead and do it." Gillgo searched his automobile. In the trunk of his car he found a canvas bag containing three sticks of dynamite, electrical dynamite fuses with wire on them, lock-picking equipment, and behind the spare tire he found a gas mask. He also found in the trunk a pair of gloves and a rope, wrenches, a metal cutting tool, a vice, some sheet metal, some keys, and one suit case. There was found in the pocket of defendant's automobile a pistol, a flashlight, a file, keys, locks, a punch, 18 skeleton keys and one lock box key.

Defendant's automobile bearing license plate Nevada C 35117 was vacuum cleaned by Gillgo and Fentress, a member of the North Carolina State Bureau of Investigation, at the police station in Washington. Fentress used a Westinghouse vacuum cleaner, the property of his wife, with new bags. R. Joseph Italien, a special agent of the Federal Bureau of Investigation attached to its laboratory in Washington, D. C., and assigned to a specific unit of the laboratory which, among other things, examines paint samples, has had special training in this work and has made thousands of such examinations. Italien received a package from the Greenville police department. From this package he examined the debris contained in the bags of the vacuum cleaner used to vacuum clean defendant's automobile. In this debris he found, among other things, a small piece of metal which he identified as white gold, a small fragment, about one-sixteenth of an inch long, the type that has all the appearance of a section that would be taken from a ring when it is reduced in size. He also found in this debris from the vacuum bags certain orange enamel paint chips which, in his opinion, could have come from the surface of the oxygen tanks found near the broken-open safe.

Jim Craft testified in substance: He is engaged in steel work, and that he uses acetylene torches in cutting steel.

Edmund G. Vivian is a special agent of the Federal Bureau of Investigation. His office is in Boston, Massachusetts. He works in Providence, Rhode Island. He first saw a ladies' watch, Omega style, Model No. A-7668, in the possession of Dominic DeCapua in Pawtucket, Rhode Island. Pawtucket is adjacent to Providence, Rhode Island. On November 18 he received this watch from Dominic De-

Capua, and forwarded it to the Federal Bureau of Investigation office in Charlotte, addressed to the agent in charge. The State introduced this watch in evidence, and Vivian identified it as the watch he received from Dominic DeCapua.

On Sunday morning, 26 October 1958, R. T. Rogerson, a member of the Greenville police department, arrived at the back of Lautares Brothers Jewelers store. At the back of this store near the corner there was one automobile track that crossed over a number of other tracks which was a little more outstanding or fresher looking than the others. He made a plaster of Paris cast of it. Afterwards in Washington, North Carolina, he took the tires off the Ford automobile bearing the license plate Nevada C 35117. This cast and these tires were examined by Lyndal L. Shaneyfelt, a special agent for the Federal Bureau of Investigation, whose duties include the examination of such items as tires and shoes and the comparison of these items to tracks and plaster casts. He testified in detail as to his training and experience in this work for many years. He testified in great detail as to the condition of one of the tires shown him and what was shown on the cast, that he placed them side by side and made a side by· side comparison, marks, measurement, comparing tread design, size and all the general and specific characteristics to determine whether the tire made the impression shown by the cast, and stated: "[I]t was my opinion that this impression in this cast could have been made by this section of the tire right here." He also testified: "In order for another tire to have made this particular impression as represented by the cast, the tire would have to be the same size, same tread design, have the same wear characteristics, and this would include this rather unusual wear on this tire where it is raised—humps in it—erratic locations, it would be very unusual wear characteristics. I have not seen one in all my examinations that had the same characteristics."

The State's evidence is circumstantial. The rule in respect to the sufficiency of circumstantial evidence to carry the case to the jury is correctly stated in an excellent opinion by Higgins, J., in *S. v. Stephens,* 244 N.C. 380, 93 S.E. 2d 431, as follows:

"We are advertent to the intimation in some of the decisions involving circumstantial evidence that to withstand a motion for nonsuit the circumstances must be inconsistent with innocence and must exclude every reasonable hypothesis except that of guilt. We think the correct rule is given in *S. v. Simmons,* 240 N.C. 780, 83 S.E. 2d 904, quoting from *S. v. Johnson,* prove the fact in issue or which reasonably conduces to its con- 199 N.C. 429, 154 S.E. 730: 'If there be any evidence tending to

clusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury.' The above is another way of saying there must be substantial evidence of all material elements of the offense to withstand the motion to dismiss. It is immaterial whether the substantial evidence is circumstantial or direct, or both. To hold that the court must grant a motion to dismiss unless, in the opinion of the court, the evidence excludes every reasonable hypothesis of innocence would in effect constitute the presiding judge the trier of the facts. Substantial evidence of guilt is required before the court can send the case to the jury. Proof of guilt beyond a reasonable doubt is required before the jury can convict. What is substantial evidence is a question of law for the court. What that evidence proves or fails to prove is a question of fact for the jury."

This has been quoted with approval in whole or in part in *S. v. Davis,* 246 N.C. 73, 97 S.E. 2d 444; *S. v. Horner,* 248 N.C. 342, 103 S.E. 2d 694; *S. v. Parrish,* 251 N.C. 274, 111 S.E. 2d 314; *S. v. Haddock,* 254 N.C. 162, 118 S.E. 2d 411; *S. v. Thompson,* 256 N.C. 593, 124 S.E. 2d 728. The rule as stated in the *Stephens* case has been approved as recently as the Fall Term 1964 in *S. v. Moore,* 262 N.C. 431, 137 S.E. 2d 812; and also as recently as the Fall Term 1965 in *S. v. Lowther,* 265 N.C. 315, 144 S.E. 2d 64.

Considering the State's evidence in the light most favorable to it, and giving it the benefit of every reasonable and legitimate inference to be drawn therefrom, it is plain that the total combination of facts shown by the evidence shows substantial evidence of all essential elements of the felonies charged in both indictments, and is amply sufficient to carry the cases charged in both indictments to the jury. The trial judge properly overruled defendant's motion for judgment of compulsory nonsuit.

Defendant's second and last assignment of error is: "The failure of the trial judge to charge on the weight and credibility of the testimony of the accomplices, William Thomas Alligood and Daniel Franklin Alligood." Defendant contends the trial judge should have charged the jury that it was their duty to receive the testimony of accomplices with caution. Defendant represented by a lawyer employed by him made no request for a special instruction to this effect. This assignment of error is overruled upon authority of *S. v. Reddick,* 222 N.C. 520, 23 S.E. 2d 909.

Although there is no assignment of error to the charge set forth in 24 pages of the record, we have read it carefully, and it is a full

and accurate charge, fair to the State and fair to the defendant, and free from error.

The evidence is fully sufficient to support the verdict and the judgments imposed on defendant. In the trial below we find

No error.

MOORE, J., not sitting.