STATE OF NORTH CAROLINA v. HAROLD GEORGE FURR

No. 73

(Filed 13 June 1977)

1. Homicide § 14.2— conviction of murder — necessary proof

In order to convict the defendant of murder, the State must offer evidence from which it can be reasonably inferred that the deceased died by virtue of a criminal act and that the act was committed by the defendant.

2. Criminal Law §§ 9, 10— principal — accessory before the fact

A principal is one who is present at or participates in the crime charged or who procures an *innocent* agent to commit the crime; an accessory before the fact is one who procures, counsels, commands, or encourages the principal to commit it.

3. Homicide § 21.2— principal in murder — insufficiency of evidence

The State's evidence was insufficient to convict defendant as a principal of first degree murder of his wife where it tended to show that defendant and his wife were separated and involved in property

State v. Furr

disputes; defendant threatened on several occasions to kill his wife; defendant approached four people, two of them on a number of occasions, and asked that they kill or find someone else to kill his wife; defendant's wife was found shot to death in her home; and a few weeks after his wife's death, defendant stated, "Well, you'all know who did it and I know who did it, but nobody else will ever know but me."

**4. Criminal Law § 1— solicitation to commit felony**

Solicitation of another to commit a felonly is a crime in North Carolina, even though the solicitation is of no effect and the crime solicited is never committed.

**5. Criminal Law § 1— solicitation to commit felony**

The gravamen of the offense of soliciting lies in counseling, enticing or inducing another to commit a crime.

**6. Homicide § 21.1— solicitation to commit murder — solicitation of someone to find another to commit murder**

The crime of solicitation to commit murder is committed where defendant solicits a named person to commit a murder himself or where defendant solicits the named person to find another to perpetrate the murder.

**7. Homicide § 12— solicitation to commit murder — indictment**

An indictment alleging defendant solicited another to murder is sufficient to take the case to the jury upon proof of solicitation to find someone else to commit murder, at least where there is nothing to indicate defendant insisted that someone other than the solicitee commit the substantive crime which is his object.

**8. Homicide § 21.1— solicitation to commit murder — sufficiency of evidence**

The State's evidence was sufficient for the jury in a prosecution of defendant for solicitation to murder his wife in January 1975 where it tended to show that during that month, shortly after defendant and the solicitee were released from jail where defendant had related his marital problems, the two men met to discuss a lot which the solicitee wanted to buy; defendant stated that "he would make some arrangements about the payment for the lot in another way" and that he wanted the solicitee "to do a job for him"; the solicitee told defendant that he "knew what he was talking about, but that [he] wasn't interested in it"; and defendant then told the solicitee that he had to go to court with his wife in a few weeks and that "he had to have something done before court time or he was going to be in serious trouble."

**9. Homicide § 21.1— solicitation to commit murder — mistaken reference to date**

The State's evidence was sufficient to support defendant's conviction of solicitation to commit murder in February 1975, although the solicitee mistakenly referred to the date of the solicitation as February 1974, where the solicitee testified to events of October 1974

State v. Furr

through June 1975 in sequence, and it is inconceivable that the jury was confused by the mistaken reference to 1974.

10. Homicide § 21.1— solicitation to commit murder — insufficiency of evidence

The State's evidence was insufficient to support defendant's conviction of solicitation of a named person in May 1975 to commit murder where it showed that defendant's remarks on that occasion were directed to a second person and that the named person was riding in an automobile with defendant and the second person when they were made.

11. Criminal Law §§ 26.5, 92.3— failure to join charges — collateral estoppel

The trial court properly refused to dismiss charges against defendant for solicitation to commit murder on the ground that the solicitation charges were not joined under G.S. 15A-926 with a murder charge at defendant's first murder trial, which ended in a mistrial, since at the time of defendant's first murder trial no indictments for solicitation had yet been returned against him; nor should the solicitation charges have been dismissed under the doctrine of collateral estoppel, which is a part of the Fifth Amendment guarantee against double jeopardy, since no issue of ultimate fact had been determined by a valid and final judgment which was sought to be relitigated in the solicitation cases.

12. Criminal Law § 1; Homicide § 21.1— solicitation to commit felony— several contacts — separate crimes

While a single solicitation to commit a felony may continue over a period of time and involve several contacts where the solicitee gives no definite refusal to the solicitor's request, a definite refusal on the part of the solicitee plus the lapse of some time may end the transaction so that a new request upon another occasion may constitute a new offense.

13. Criminal Law § 113.1— refusal to allow testimony to be read to jury

Defendant was not prejudiced by the court's refusal of the jury's request that the testimony of a State's witness be read to them.

Justice LAKE dissenting in part.

Chief Justice SHARP and Justice HUSKINS join in the dissenting opinion.

ON defendant's appeal from *Albright, J.,* presiding at the March 22, 1976 Criminal Session of STANLY Superior Court. This case was docketed and argued as Case No. 73, Fall Term 1976.

*Rufus L. Edmisten, Attorney General, by James Wallace, Jr., Assistant Attorney General,* for the State.

*Hopkins, Hudson & Tucker, by Elton S. Hudson, and Tharrington, Smith & Hargrove, by Roger W. Smith, Attorneys* for the defendant.

EXUM, Justice.

Defendant was placed on trial for and convicted of murder in the first degree of his wife and twelve counts of solicitation to commit a felony. He was sentenced to death in the murder case and was given three consecutive sentences of 8-10 years each in the solicitation cases. Nine of those cases were consolidated for one judgment by the trial court. Two separate judgments were entered in two others, and in one apparently no judgment was entered upon the verdict.

The state's evidence tends to show that defendant threatened to kill his wife, that he was separated from her and involved in property disputes with her. It also tends to show that defendant approached four people, George Arnold Black, Donald Lee Owens, Raymond Clontz and Donald Eugene Huneycutt, two of them upon a number of occasions, asking that they kill or find someone else to kill his wife or her attorney, Charles Brown, or another acquaintance, Johnny Jhue Laney. His defense to the murder charge was alibi. He denied the solicitation charges.

Defendant presents twelve arguments on appeal. Of most significance is his contention that nonsuit should have been granted in the murder case, since there is no evidence that it was Furr who killed his wife. We agree and hold that nonsuit should have been granted.

Of the assignments of error remaining, those pertaining to the nature of the offense of solicitation are of most significance. Most notably, defendant argues that: (1) in several of the solicitation cases nonsuit should have been granted; (2) proof that defendant solicited a named person to solicit another to commit murder is not proof of any criminal offense in North Carolina; (3) there was a fatal variance between indictments and proof where the indictments alleged that defendant solicited another to kill and murder the victim but the proof is that defendant solicited the named person to find someone else to kill the victim; and (4) several contacts between defendant and a solicitee constitute only one offense.

We find merit in defendant's argument that one of the solicitation charges should have been nonsuited. In the second and third contentions above we find no merit. The last argument

State v. Furr

we find unnecessary to address definitively since all the counts of solicitation at issue were consolidated for judgment.

The facts will be discussed in connection with the issues to which they pertain.

To prove that defendant murdered his wife, the state relies entirely upon circumstantial evidence. To withstand the motion for nonsuit, there must be substantial evidence of all material elements of the offense. *State v. Evans,* 279 N.C. 447, 183 S.E. 2d 540 (1971) ; *State v. Morgan,* 268 N.C. 214, 150 S.E. 2d 377 (1966) ; *State v. Roux,* 266 N.C. 555, 146 S.E. 2d 654 (1966). The evidence must be considered in the light most favorable to the state, and every reasonable inference must be drawn in the state's favor. *State v. Carter,* 289 N.C. 35, 220 S.E. 2d 313 (1975), *death sentence vacated,* 96 S.Ct. 3212 (1976) ; *State v. McKnight,* 279 N.C. 148, 181 S.E. 2d 415 (1971). Defendant's evidence rebutting the inference of guilt may be considered only insofar as it explains or clarifies evidence offered by the state or is not inconsistent with the state's evidence. *State v. Blizzard,* 280 N.C. 11, 184 S.E. 2d 851 (1971) ; *State v. Evans, supra; State v. Bruton,* 264 N.C. 488, 142 S.E. 2d 169 (1965) ; *State v. Oldham,* 224 N.C. 415, 30 S.E. 2d 318 (1944).

Applying these guidelines, we find the evidence sufficient to allow the jury to find the following facts:

The defendant and his wife had been married about 21 years and had four children when they separated in 1973. After the separation, Furr moved his real estate office from their home to a nearby location near the square in Locust, North Carolina. His wife, Earlene, continued to live at the house on Willow Drive and Furr moved into Western Hills Mobile Home Park. The couple's relationship was apparently quite volatile and Furr exhibited increasing hostility towards Earlene after the separation.

In April, 1973, Earlene filed a civil action against defendant resulting in a judgment against him in October, 1973. A year later, on his wife's motion, defendant was adjudged to be in contempt and was committed to jail. While in Stanly County jail, Furr met Raymond Clontz and Donald Owens, and related his marital problems to them, especially his concern over the property dispute. He was released from jail on December 6, 1974, upon payment of $13,623.00. After his release, Furr ap-

proached Clontz and Owens, drove them by Earlene's home and explained how to get into the house. He offered Owens $3,000.00 to kill Earlene and offered to give Clontz a lot which the latter wanted to store cars on if Clontz would do the job. Neither man accepted the offer.

In October, 1974, defendant asked "Buck" Baker if he knew a "hit man." At the time Furr was angry because Earlene had disposed of some racing equipment. Furr also approached Donald Eugene Huneycutt on several occasions to ask whether Huneycutt knew a "hit man." In the initial encounters, Furr wanted Johnny Jhue Laney killed because Laney had murdered his own wife, Doris, who was defendant's girl friend. By early 1975, however, Furr's plans extended as well to Earlene and her attorney, Charles Brown. Huneycutt told him killing women and lawyers would create "too much heat," but defendant responded that he could stand the heat and had his mother for an alibi.

Defendant also asked George Arnold Black, Jr., to kill Earlene, and drove him by the house in the fall of 1974. Like the others, Black declined the offer.

Furr was heard to threaten Earlene's life upon several occasions. In February, 1973, Earlene's brother-in-law, David Orrell, went to defendant because Earlene "was literally in terror of her life." Orrell told defendant, "She says that you had threatened to kill her, is that true?" Furr responded that he had, and added, "I can't stand her nagging any more."

In January, 1973, Johnny Jhue Laney called Furr to object to Earlene's telephone calls to Doris Laney accusing Doris of running around with Furr. A month later, Laney called Furr again concerning the same problem. Furr flew into a rage and said "he would kill her, and he would see to it, it wouldn't happen no more . . . that she had caused enough trouble in the community."

In the early part of 1975, during a conversation with Freddie Voncannon, the sister of Ruby Griffin, who was presently defendant's girl friend, Furr suggested Freddie burn Earlene's car.

Just after the 1973 separation, defendant's daughter, Beverly Tucker, overheard her mother begging defendant to come home. Furr responded that "she was ugly and he didn't want

her anymore, and that he hated her and that he would kill her, but he was going to make her suffer first and that he would grind her up like hamburger meat and feed her to the dogs." Once in 1974, when Beverly was driving her mother's car, defendant warned her to be careful driving that car through his trailer park, that he had told Earlene he would kill her if she came there, and he would hate to hit Beverly instead.

Rick Tallent, who had rented a pasture from Earlene, was embroiled in one of the couple's quarrels when he attempted to repair the fence. He heard defendant tell Earlene he would kill her if she came across the fence. Defendant's son, Chuck, also overheard that threat.

On 3 September 1975 defendant was served with papers in the matter of *Frances Earlene H. Furr v. Harold G. Furr,* notifying him to appear on 25 September 1975.

Very little evidence was presented of what actually transpired at the time of Earlene's death on 15 September 1975. Chuck Furr, the last to leave home that morning, testified that when he left at about 8:00 his mother was standing in the doorway. At about 2:15 that afternoon, eleven-year-old Todd came home from school and found his mother lying on his bed, dressed in a pink nightgown and valuable jewelry, with two gunshot wounds, one in the chin and one in the eye. An SBI chemist testified that Earlene's left-hand palm was either on or near a gun when it was discharged. There was no evidence of forcible entry. The front door was unlocked when Todd came home and the garage door closed. Earlene's watch crystal was broken and the hands stopped at 9:45 or 9:56 or sometime between 10:00 and 12:00 according to the testimony of various state's witnesses. The watch calendar said "15."

Several guns were found both in Earlene's home and in defendant's. None of these was connected to the crime. None of the fingerprints lifted from the scene matched defendant's. Defendant testified that he possessed a remote control device to open the garage door. Raymond Clontz said defendant had shown him the device.

One witness, Cecil Almond, said he saw defendant coming out of the trailer park with a lady in the car who "looked like Earlene" at about 9:30 or 9:40 on 15 September 1975. Nevertheless, he testified that he did not actually recognize the lady,

and acknowledged the possibility that it might have been Ruby Griffin.

The trip from defendant's trailer to Earlene's home takes about four minutes and forty seconds.

Defendant's alibi evidence tended to show he was in the company of Ruby Griffin almost constantly from between 9:00 and 9:30 that morning, when they left the trailer park together, until late that night. He presented numerous witnesses who had seen him with Ruby Griffin at various times in his office and at work sites between about 10:00 and noon. His testimony and that of his witnesses tends to establish that he and Ruby drove to Salisbury at about noon, were seen on the road, visited a friend there, and returned at about 5:15 to 5:30, when they learned of Earlene's death.

The defense presented the testimony of a hostile witness, Gary Henry, who had testified at defendant's previous trial that he saw Earlene at her home at about 11:15 on the morning of 15 September 1975 when he went by after a dentist appointment. At this trial, he testified that he was not sure what time that morning he had seen her, but it was either 9:35 to 9:40 or 11:15.

A few weeks after his wife's death, defendant saw Owens and Clontz. On being asked who had killed his wife, Furr said, "Well, you'all know who did it and I know who did it, but nobody else will ever know but me."

Defendant told Johnny Laney that "that ex-bitch of mine got what she deserved and you're next on the list."     .

Defendant contends this evidence is insufficient to permit a jury to find him guilty of murder. We agree.

[1] In order to convict the defendant of murder the state must offer evidence from which it can be reasonably inferred that the deceased died by virtue of a criminal act and that the act was committed by the defendant. *State v. Jones,* 280 N.C. 60, 184 S.E. 2d 862 (1971) ; *State v. Palmer,* 230 N.C. 205, 52 S.E. 2d 908 (1949).

While the evidence clearly establishes the first of these propositions it falls far short of tending to prove the second. The evidence shows that defendant wanted his wife dead; that he actively sought her death; and that he harbored great hos-

tility toward her. This, however, without more is not enough to permit a jury to find that he killed her. *See State v. Jones, supra; State v. Palmer, supra; see also State v. Carter,* 204 N.C. 304, 168 S.E. 204 (1933) ; *State v. Montague,* 195 N.C. 20, 141 S.E. 285 (1928) ; *State v. Gragg,* 122 N.C. 1082, 30 S.E. 306 (1898) ; *State v. Brackville,* 106 N.C. 701, 11 S.E. 284 (1890).

[2] While the evidence might support a reasonable inference that defendant was responsible for his wife's death and that he procured someone to murder her, these facts alone would not make defendant guilty of murder. Our law of homicide still maintains a careful distinction between principals and accessories. A principal is one who is present at and participates in the crime charged or who procures an *innocent* agent to commit the crime. An accessory before the fact is one who procures, counsels, commands, or encourages the principal to commit it. *State v. Benton,* 276 N.C. 641, 174 S.E. 2d 793 (1970).

[3] The only question before us is whether the evidence is sufficient to convict defendant as a principal. We hold that it is not.

The state contends the closest factual situation to this case is found in *State v. Rinaldi,* 264 N.C. 701, 142 S.E. 2d 604 (1965). In *Rinaldi,* defendant's wife died of suffocation between 10:00 a.m. and 5:00 p.m. on 24 December 1963. Defendant and a friend, who testified they had been shopping all morning, were in the apartment when police arrived to find the body. *Rinaldi* is clearly distinguishable not only because defendant's presence at the scene at approximately the time of the killing was established, but also because defendant told a witness at noon on the day of the killing, "It is over, I did it." In the instant case, defendant's remarks after the crime tend to show only that he knew who killed his wife, not that he did so himself.

We have said that where "the State failed to offer substantial evidence that defendant was the one who shot his wife," nonsuit should be granted. *State v. Jones, supra* at 67, 184 S.E. 2d at 866. The evidence here is "sufficient only to raise a suspicion or conjecture as to whether the offense charged was committed . . . . " *State v. Evans,* 279 N.C. 447, 453, 183 S.E. 2d 540, 544 (1971). Defendant's motion for nonsuit must therefore be sustained.

We next consider defendant's argument that ten of the solicitation charges should have been nonsuited. With respect to the seven indictments alleging solicitation of Donald Eugene Huneycutt to commit murder, defendant's argument is made upon two grounds: first, that the evidence did not establish solicitation to commit a felony and second, that the evidence is at variance with the allegations.

The first contention is directed to the state's alleged failure to prove the substantive crime of solicitation to commit a felony.

[4] Solicitation of another to commit a felony is a crime in North Carolina, even though the solicitation is of no effect and the crime solicited is never committed. *State v. Hampton,* 210 N.C. 283, 186 S.E. 251 (1936); *State v. Keen,* 25 N.C. App. 567, 214 S.E. 2d 242 (1975); 2 Strong's North Carolina Index 2d, Criminal Law § 1 at 479. The offense has been coznizable at common law at least since *Rex v. Higgins,* 2 East 5, 102 Eng. Rep. 269 (1801) and is still an indictable offense under the common law in this state. G.S. 4-1.

[5] The gravamen of the offense of soliciting lies in counseling, enticing or inducing another to commit a crime. Clark & Marshall, A Treatise on The Law of Crime, § 4.02 at 220 (7th ed. 1967).

[6] Defendant argues that the evidence shows only that defendant requested that Huneycutt find *someone else* to murder each of the three intended victims, and not that Huneycutt *himself* commit the crime. "Under no authority," says defendant, "is that a criminal offense." Accepting for the moment defendant's argument that defendant solicited Huneycutt *only* to find another "hit man," we hold that such a request constitutes the crime of solicitation to commit a felony in North Carolina. In W. LaFave and A. Scott, Criminal Law, § 58 at 419 (1972) it is observed that

> "[i]n the usual solicitation case, it is the solicitor's intention that the criminal result be directly brought about by the person he has solicited; that is, it is his intention that the crime be committed and that the other commit it as a principal in the first degree, as where A asks B to kill C. However, it would seem sufficient that A requested B to get involved in the scheme to kill C in any way which would establish B's complicity in the killing of C were that to occur. Thus it would be criminal for one person to solicit

another to in turn solicit a third party, to solicit another to join a conspiracy, or to solicit another to aid and abet the commission of a crime."

*See People v. Bloom,* 149 App. Div. 295, 133 N.Y.S. 708 (1912) ; *King v. Bentley,* [1923] 1 K.B. 403 (1922).

In North Carolina, one who procures another to commit murder is an accessory before the fact to murder. G.S. 14-5. Thus if Huneycutt had acceded to defendant's demands and had found someone else to murder defendant's wife or either of the other victims, and that person had in turn committed the murder Huneycutt would have been indictable for a felony under General Statute 14-5. *See State v. Philyaw,* 291 N.C. 312 (1976). Whether defendant solicited Huneycutt to commit the murder himself or to find another to perpetrate the crime is thus of no consequence; either act is a crime in this state.

Of little more merit is defendant's second argument relating to nonsuit of the Huneycutt solicitation charges. Defendant claims that because the indictments alleged that he "did feloniously, infamously, and with malice, solicit Donald Eugene Huneycutt, to feloniously *kill and murder* [the various victims], this being a crime of soliciting . . . to commit a felony," (emphasis added) but the proof was only that defendant solicited Huneycutt to find someone else to murder the victims, there was a fatal variance between the indictment and the proof.

Defendant's conversations with Huneycutt are obviously designed to accomplish one end: to procure the deaths of Johnny Jhue Laney, Earlene Furr and Charles Brown. There is no intimation whatever in the evidence that defendant would not have been delighted to have Huneycutt himself commit the murders. Defendant had known Huneycutt for many years, and undoubtedly wished to avoid offending him. He obviously meant his requests to cover the broadest ground possible, to leave it open to Huneycutt to give him as much assistance as he might be willing to give. Defendant told Huneycutt how he wanted the job done and said he wanted to take Honeycutt over and show him how easy "you could get right up on" Laney. He offered Huneycutt extra money to get Laney shot between the eyes where Laney had shot his wife, Doris.

**[7]** Not every variance between the indictment and the proof is a material variance. *See State v. Ballard,* 280 N.C. 479, 186

S.E. 2d 372 (1972); *State v. Rogers,* 273 N.C. 208, 159 S.E. 2d 525 (1968); *Wright v. State,* 468 S.W. 2d 422 (Tex. Crim. App. 1971). The gist of this crime is the solicitation itself and not the nature of the crime solicited. *People v. Baskins,* 72 Cal. App. 2d 728, 165 P. 2d 510 (1946); *People v. Humphrey,* 27 Cal. App. 2d 631, 81 P. 2d 588 (1938). Thus, although it remains essential to the validity of the indictment that it advise the defendant of the nature and cause of the accusation sufficiently to allow him to meet it, to prepare for trial and to enable him to plead in bar of further prosecution after judgment, it is not necessary to allege with technical precision the nature of the solicitation. In this regard an indictment for soliciting to commit a felony is analogous to one for conspiracy, in which it is sufficient to allege generally the object of the conspiracy. *See Wong Tai v. United States,* 273 U.S. 77 (1927). Thus an indictment alleging defendant solicited another to murder is sufficient to take a case to the jury upon proof of solicitation to find someone else to commit murder, at least where there is nothing to indicate defendant insisted that someone other than the solicitee commit the substantive crime which is his object.

[8]    Defendant further contends that there was no evidence to support three indictments alleging solicitation of Raymond Clontz to murder Earlene Furr. There is no merit to these contentions in two of the counts. Indictment Number 76-CR-700 alleges that Clontz was solicited in January to murder Furr's wife. The evidence is that during that month, shortly after both men were released from jail where defendant had been quite talkative about his marital problems, Clontz and Furr met to discuss a lot which Clontz wished to purchase. Furr said he wanted $3,000.00 for the lot and Clontz agreed to take it. Then, as Clontz related at trial, Furr told him not to be so hasty, that "he would make some arrangements about the payment for the lot in another way; that he wanted me to do a job for him." Clontz told Furr that he "knew what he was talking about, but that [he] wasn't interested in it . . . . " Defendant then told him he had to go to court with his wife in a few weeks and "that he had to have something done before court time or he was going to be in serious trouble. He said his wife was already getting $250.00 a week from him, and she had possession of the house, and had his property tied up and that he had to have something done." In the context, we find no other rea-

sonable interpretation of defendant's words on this occasion than that he was requesting Clontz to kill his wife.

[9] Indictment Number 76-CR-691 alleged a solicitation in February, 1975. The state concedes that Clontz mistakenly referred to the date of this solicitation as February, 1974. It argues that since Clontz testified he met defendant when he entered the Stanly County jail in October, 1974, and that the conversation in question occurred when Furr came to his garage "a few weeks" after the previous solicitation which occurred in January, 1975, the jury could not have understood the reference to the date to mean February, 1974. This was clearly a slip of the tongue. Since Clontz testified to the events of October, 1974, through June, 1975, in sequence it is inconceivable that any confusion could have resulted. Moreover, on cross-examination, in recounting the February, 1975, occurrence, Clontz reiterated: "It was in February of 1975 that we went by his wife's house and made the detour through the country," which matched his testimony during direct examination except for the date. We note that there is nothing in the record to indicate any judgment having been entered upon this indictment.

[10] In indictment Number 76-CR-690, a solicitation in May, 1975, is alleged. Clontz's testimony is that "sometime later" (after the February incident) he and Owens were stopped by defendant as they took lumber to Locust. Defendant contends all the evidence points to a solicitation directed only to Owens. Although Clontz testified that Furr asked Owens if "we had time to ride with him somewhere," it is apparent that Furr's remarks on this occasion were directed solely to Owens, and in fact, constituted a repetition of his earlier February conversation and ride with Clontz. During the May solicitation, Clontz rode in the back seat. He testified that Furr did not speak to him then, and that he did not make any statements to Clontz because he was talking to Owens. We find, therefore, no evidence except that leading to pure speculation that Furr intended Clontz to hear his suggestion to support the charge of solicitation of Raymond Clontz in May, 1975. Consequently we hold that case Number 76-CR-690 must be nonsuited. We note that, since this case was consolidated for judgment with the other Clontz and Huneycutt cases, our ruling has no effect on the sentence defendant will serve.

[11] Defendant's next assignment of error is addressed to the court's failure to dismiss the solicitation charges because they

were not joined under General Statute 15A-926[1] with the murder prosecution at defendant's first murder trial, which terminated in a mistrial. He argues as well that the charges should have been dismissed under the rule of *Ashe v. Swenson*, 397 U.S. 436 (1970), which held the doctrine of collateral estoppel to be applicable against the states as part of the Fifth Amendment guarantee against double jeopardy. Both arguments under this assignment of error are feckless. General Statute 15A-926 simply does not apply in this case. At the time of defendant's first trial for murder on January 12, 1976, no indictments had yet been returned against him for solicitation; the bills of indictment for that offense were not returned until 9 February 1976. They could not, therefore, have been joined with the murder charge. There is nothing whatever in the record to indicate that the state held the solicitation charges in reserve pending the outcome of the murder trial as defendant suggests, nor is the doctrine of collateral estoppel applicable here for a number of reasons. Suffice it to say that no "issue of ultimate fact" had been determined by a valid and final judgment which was sought to be relitigated in the solicitation cases. *Ashe v. Swenson, supra* at 443. *See State v. McKenzie*, 292 N.C. 170, 232 S.E. 2d 424 (1977); *State v. Ballard*, 280 N.C. 479, 186 S.E. 2d 372 (1972). *Cf. State v. Hicks*, 233 N.C. 511, 64 S.E. 2d 871, *cert. denied*, 342 U.S. 831 (1951).

Defendant's next contention is that the court erred in denying his motions to compel the state to elect among the several solicitation charges and to dismiss the solicitation charges and in submitting to the jury the issue of defendant's guilt of these charges. Defendant argues that the three Clontz solicitation contacts establish only one offense and that the seven Honeycutt contacts likewise establish only one offense. Neither of the two North Carolina cases dealing with solicitation addresses this issue. *State v. Hampton*, 210 N.C. 283, 186 S.E. 251 (1936); *State v. Keen*, 25 N.C. App. 567, 214 S.E. 2d 242 (1975). In the latter case, as defendant correctly points out, five contacts were made between the same parties but only one count of

---

[1] (a) Joinder of Offenses. — Two or more offenses may be joined in one pleading when the offenses . . . are based on the same act or transaction or on a series of acts or transactions connected together or constituting parts of a single scheme or plan. . . .
 . . . .
(c) (2) A defendant who has been tried for one offense may thereafter move to dismiss a charge of joinable offense.

solicitation was charged. The distinction between that case and this is that in *Keen* the solicitee never directly refused the defendant's request but "kept him on the string" in order to gather evidence for a conviction.

[12]  Defendant analogizes solicitation to conspiracy, and says that only one offense of conspiracy is committed even though there may be multiple discussions and multiple criminal objectives, citing *Braverman v. United States*, 317 U.S. 49 (1942). This Court has already noted the distinction between conspiracy, which involves the concurrence of a second person with defendant, and solicitation, which is an act "completed before the resisting will of another had refused its assent and cooperation." *State v. Hampton, supra.* We recognize that, as in *Keen*, a single solicitation may continue over a period of time and involve several contacts where the solicitee gives no definite refusal to the solicitor's request. But a definite refusal on the part of the solicitee plus the lapse of some time may end the transaction so that a new request upon another occasion may constitute a new offense.

If defendant's contentions were correct, he would be entitled to have only one sentence imposed for the Clontz solicitation contacts, and only one for the Huneycutt contacts. *Cf. Braverman v. United States, supra.* In this case, however, the seven Huneycutt indictments and two of the Clontz indictments were consolidated for judgment and one 8-10 year sentence imposed thereon. (No judgment has apparently been entered in the other Clontz indictment.) Since only one sentence was imposed for all of these, no prejudice to defendant could have resulted from error in submitting each contact as a separate count of solicitation.

Defendant next assigns as error portions of the court's charge to the jury relating to the nature and effect of circumstantial evidence. Since we have held that nonsuit must be granted in the murder case and since all the evidence of solicitation is direct evidence, we find it unnecessary to consider these assignments.

[13]  Lastly defendant contends that the court erred in refusing the jury's request that the testimony of Huneycutt be read to them. Defendant argues that such reading would have supported his jury argument that the witness Huneycutt had lied as evidenced by an inconsistency in dates between his testimony and

that of witness Laney. We find nothing in the record to indicate the reason for the jury's request, and it was not repeated. Moreover the court's ruling on the jury's request was not made until after a conference in chambers with counsel and the record indicates that defendant's counsel responded negatively to the court's query whether there was any objection by defendant to the action of the court. Defendant concedes in his brief that ordinarily the decision whether to grant or refuse the jury's request for a restatement of the evidence lies within the discretion of the trial court. *State v. Hatch*, 21 N.C. App. 148, 203 S.E. 2d 334, *cert. denied*, 285 N.C. 375, 205 S.E. 2d 100 (1974) ; *State v. Crane*, 11 N.C. App. 721, 182 S.E. 2d 225 (1971) ; 23A C.J.S., Criminal Law, § 1377. We find no error prejudicial to defendant in this instance.

The remaining assignments of error need not be addressed because of our holding that nonsuit must be granted in the murder case.

In cases Number 75-CR-6564 (murder) and Number 76-CR-690 (solicitation) we find error in the failure to allow defendant's motion for nonsuit and those cases are therefore reversed.

In the remaining cases of solicitation we find no error.

Cases No. 75-CR-6564 and 76-CR-690 REVERSED.

No ERROR in Cases No. 76-CR-691, 76-CR-692, 76-CR-693, 76-CR-694, 76-CR-695, 76-CR-696, 76-CR-697, 76-CR-698, 76-CR-699, 76-CR-700, 76-CR-702.

Justice LAKE dissenting in part.

I dissent from that portion of the decision which holds that the defendant's conviction of murder is reversed and a nonsuit in that case must be granted. In my opinion, the evidence is sufficient to permit reasonable men to find that the defendant, either in person or through a killer procured by him for that purpose, murdered his wife. Consequently, the evidence was sufficient, in my opinion, to carry this case to the jury and to support its verdict of guilty of murder in the first degree. If that be true, the sentence to death must be vacated and a new judgment entered sentencing the defendant to life imprisonment by virtue of the decision of the Supreme

State v. Furr

Court of the United States in *Woodson v. North Carolina*, 428 U.S. 280 (1976).

I concur in so much of the decision and majority opinion as relates to the several charges of solicitation to commit the felony of murder.

Chief Justice SHARP and Justice HUSKINS join in this dissenting opinion.